7:22cv00238

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
Roanoke Division

| | |
|---|---|
| JOSHUA LEE SMITH, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| TWIN COUNTY REGIONAL HEALTHCARE, | ) |
| FOUR UNNAMED DOCTORS AND NURSES | ) |
| OF TWIN COUNTY REGIONAL | ) |
| HEALTHCARE (DOCTOR A AND NURSES | ) |
| B, C, D); | ) |
| | ) |
| KARL R. HADE, EXECUTIVE SECRETARY OF | ) |
| THE SUPREME COURT OF VIRGINIA, in his | ) |
| official capacity, | ) |
| JUDGE F, in his official capacity; | ) |
| | ) |
| CARROLL COUNTY SHERIFF KEVIN A. | ) |
| KEMP, in his official capacity, | )     **JURY TRIAL DEMANDED** |
| FIVE UNNAMED POLICE DEPUTIES OF | ) |
| CARROLL COUNTY SHERIFF'S OFFICE | ) |
| (DEPUTIES V, W, X, Y, AND Z), | ) |
| in their individual and official capacities; | ) |
| | ) |
| NEW RIVER VALLEY REGIONAL JAIL | ) |
| AUTHORITY, | ) |
| THREE UNNAMED OFFICERS OF NEW RIVER | ) |
| VALLEY REGIONAL JAIL | ) |
| (JAIL OFFICERS 1, 2, 3), | ) |
| in their individual and official capacities, and | ) |
| | ) |
| DOE OFFICERS 4 and 5, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

1

## INTRODUCTION

The last time Joshua Lee Smith ("Plaintiff" or "Mr. Smith") could move his arms and legs, four police deputies were hurling him headfirst into the back of a police van. What began for Mr. Smith as an attempt to seek medical care for radiating pain throughout his upper body and a worrisome numbness in his legs escalated into a life-threatening chain of events.

At every turn, Mr. Smith was denied urgent medical care and subjected to excessive force because of the harmful associations Defendants made with his disability. Upon arriving at the emergency room and complaining of pain and loss of function in his legs, the nurses and doctors refused to treat him, claiming he was a drug addict. Instead, they called the police. The deputies brutally assaulted Mr. Smith, dragging him in and out of police vehicles and jeering taunts at him. Brought before a judge, Mr. Smith received no kinder treatment: he was told he could avoid incarceration only if he could "stand up" and speak to the judge "like a man," even though he could not move his legs. After a torturous rough ride to a jail 30 miles away that caused Mr. Smith to lose consciousness and struggle to breathe, the jail staff abandoned him face down in his cell with a ruptured abscess in his spine.

Defendants practically ended Mr. Smith's life. As a result of these events, Mr. Smith was rendered quadriplegic, has permanently lost all feeling below his chest, and can no longer care for himself. In addition to his physical injuries, the enduring emotional trauma stemming from these injuries prevents Mr. Smith from sleeping for longer than two hours per night and haunts him constantly, causing him mental anguish, anxiety, and depression. He lives with the devastating awareness he will never be able to hug his family again.

This action seeks to hold these dangerous actors accountable for violations of Mr. Smith's constitutional rights—including his due process rights and right to be free from unreasonable

conditions of confinement during a seizure—as well as for medical malpractice, violations of the Affordable Care Act and Americans With Disabilities Act, assault, battery, negligence, negligent infliction of emotional distress and intentional infliction of emotional distress. The Defendants' treatment of Mr. Smith was so egregious that it simply shocks the contemporary conscience.

## I.     JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because they arise under the United States Constitution and federal civil rights laws of the United States. Jurisdiction is also conferred by 42 U.S.C. § 1983 for violations of Plaintiff's rights under the United States Constitution.

2.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claims under state and local laws because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

3.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants are subject to the personal jurisdiction of this Court and a substantial part of the events giving rise to the claims occurred in Carroll, Grayson, and Pulaski counties in Virginia.

## II.     PARTIES

### A.  Plaintiff

4.      Plaintiff Joshua Smith ("Plaintiff" or "Mr. Smith") is a forty-two-year-old citizen of North Carolina.

5.      Mr. Smith is paralyzed from the chest down, permanently bedridden, and spends most of his time living in hospitals and assisted living facilities in North Carolina. He has two minor daughters who reside in Virginia.

6.      Mr. Smith is 5 feet 6 inches tall and, at the time of the events alleged herein, weighed approximately 170 pounds.

**B. Defendants**

7.      Defendant Twin County Regional Healthcare ("Twin County Hospital" or "TCRH") is a hospital in Galax, Virginia, which is between Grayson and Carroll counties in the Commonwealth of Virginia. Defendant TCRH receives federal financial assistance through serving a large Medicare population.[1]

8.      Defendant Doctor A is a medical doctor who was providing health care services in the emergency room of Twin County Hospital on or around the night of May 3, 2020.

9.      Defendant Nurses B, C, and D were medical staff and/or nurses providing health care services in the emergency room of Twin County Hospital on or around the night of May 3, 2020.

10.      Defendants Twin County Hospital; Doctor A; and Nurses B, C, and D, are hereafter collectively referred to as "Medical Defendants" in this action.

11.      Defendant Karl R. Hade is the Executive Secretary for the Office of the Executive Secretary of the Virginia Supreme Court, which assists with Americans with Disabilities Act accommodations for public programs and services of Magistrate judges of the Commonwealth of Virginia. Under Va. Code § 17.1-315, Hade has a duty to "assist the Chief Justice and the Supreme Court in the administration of the judicial branch of the government to the end that litigation may be expedited and the administration of justice improved in the courts of the Commonwealth." The Office of the Executive Secretary of the Supreme Court of Virginia has a duty to comply with the requirements of Title II of the ADA and make all reasonable modifications to policies and

---

[1] Twin County Regional Healthcare, *About us*, https://www.tcrh.org/about [https://perma.cc/4LZL-SSM2] (last visited May 3, 2022).

programs to ensure that people with disabilities have an equal opportunity to enjoy all of its programs, services, and activities.

12.     Defendant Judge F is an officer of the unified judicial system of the Commonwealth of Virginia, and presided over Mr. Smith's bond hearing on or about May 3, 2020 of the events described herein. Judge F is sued in his official capacity.

13.     Kevin A. Kemp is the Sheriff for Carroll County and the top law enforcement agent responsible for overseeing CCSO. Sheriff Kemp was the Sheriff for Carroll County at all times relevant to the events in this Complaint, and was responsible for executing the policies and procedures of Carroll County and overseeing CCSO and all of its deputies during that time. Sheriff Kemp is sued in his official capacity.

14.     Upon information and belief, Deputy V is a deputy of the Carroll County Sheriff's Office and was employed by the CCSO at all times relevant to the events in this Complaint. Deputy V is sued in his individual and official capacities.

15.     Upon information and belief, Deputy W is a deputy of the Carroll County Sheriff's Office and was employed by the CCSO at all times relevant to the events in this Complaint. Deputy W is sued in his individual and official capacities.

16.     Upon information and belief, Deputy X is a deputy of the Carroll County Sheriff's Office and was employed by the CCSO at all times relevant to the events in this Complaint. Deputy X is sued in his individual and official capacities.

17.     Upon information and belief, Deputy Y is a deputy of the Carroll County Sheriff's Office and was employed by the CCSO at all times relevant to the events in this Complaint. Deputy Y is sued in his individual and official capacities.

18.     Upon information and belief, Deputy Z is a deputy of the Carroll County Sheriff's Office and was employed by the Department at all times relevant to the events in this Complaint. Deputy Z is sued in his individual and official capacities.

19.     On information and belief, Defendants Deputies V, W, X, Y and Z, ("Deputies V–Z") are trained and employed by the Carroll County Sheriff's Office. On or about May 3–5, 2020, they brutalized and permanently disabled Mr. Smith while he was in their custody.

20.     Deputies V–Z were carrying out the policies and customs of Carroll County, acting under color of state law, and acting with authority conferred by CCSO at all times relevant to the events in this Complaint.

21.     The New River Valley Regional Jail Authority ("NRVRJA") operates and is responsible for overseeing the New River Valley Regional Jail ("NRVRJ"). NRVRJA was the authority overseeing NRVRJ at all times relevant to the events in this Complaint, and was responsible for executing the policies and procedures of NRVRJ and overseeing NRVRJ and all of its deputies during that time.

22.     Upon information and belief, New River Valley Regional Jail Officers 1–3 ("Jail Officers 1–3") are deputies of the NRVRJ, located in Dublin, Virginia, that were on duty on or about May 3, 2020. Jail Officers 1–3 were employed by the Jail and acting under color of state law at all times relevant to the events in this complaint. Jail Officers 1–3 are sued in their individual and official capacities.

23.     Defendants Carroll County Sheriff Kevin A. Kemp; Deputies V–Z; NRVRJA; and New River Valley Regional Jail Officers 1–3 are hereafter collectively referred to as "State-Actor Defendants" in this action.

24.     Upon information and belief, Doe Deputies 4 and 5 are county or state deputies who were responsible for monitoring Mr. Smith in his jail cell at NRVRJ and in his hospital room at Roanoke Hospital on or around May 3, 2020.

### III.    FACTUAL ALLEGATIONS[2]

#### A.  Mr. Smith's Medical History

25.     In or around 2004, Mr. Smith received a lower back surgery at Carilion Roanoke Memorial Hospital to treat symptoms of a degenerative disk disease.

26.     In the wake of his back surgery, Mr. Smith was prescribed opioid pain medication.

27.     A month or two following the surgery, Mr. Smith's pain had not subsided as much as was expected. Mr. Smith was told that the surgery had caused damage to his sciatic nerve, resulting in ongoing pain in his back and legs.

28.     Because of the damage to his sciatic nerve, doctors advised Mr. Smith that he would need to be on pain medication for a while longer, and he was sent to Revival Pain Management, a pain management clinic.

29.     Mr. Smith visited Revival Pain Management once per month. The clinic was responsible for facilitating the prescription and monitoring of Mr. Smith's opioid medication.

30.     In the years following Mr. Smith's back surgery, he visited Twin County Regional Healthcare at least five times to treat issues related to the pain in his back and legs.

31.     Mr. Smith's ongoing need for pain medication to treat the complications from his lower back surgery resulted in the development of an addiction to pain medication. As a result, Mr. Smith has a substance use disorder.

---

[2] Unless otherwise indicated, the factual allegations are made upon reasonable knowledge, information and belief.

32.     Mr. Smith's substance use disorder and surgery complications put him at heightened risk for osteomyelitis, sciatic nerve damage, epidural abscesses, loss of sensation, loss of neurological function, and loss of motor function.

## B.  Mr. Smith's Medical Emergency

33.     On or about May 3, 2020, Mr. Smith was in the middle of a visit to his children and family in Virginia when he experienced a medical emergency.

34.     Around 8:00 pm on the evening of or about May 3, 2020, Mr. Smith began to feel a radiating, acute pain in his neck, hands, and shoulders.

35.     Mr. Smith immediately noticed that the pain was accompanied by a loss of sensation and impaired function in his limbs. He felt his legs beginning to numb, and when he attempted to stand, he realized he was unable to walk without assistance.

36.     Mr. Smith collapsed onto the floor. Alarmed, he asked the mother of his children to call 911.

37.     While an ambulance was on the way, the 911 operator advised the family not to move Mr. Smith from the floor because his inability to walk could indicate a neurological injury.

38.     When the ambulance arrived, Mr. Smith could no longer reliably stand or walk, and the first responders who arrived entered the home to transport Mr. Smith from the bathroom floor to the ambulance.

39.     The first responders secured Mr. Smith on a stretcher and drove him in an ambulance to the emergency room at Twin County Regional Healthcare in Galax, Virginia.

## C.  Mr. Smith's Denial of Life-Saving Care at Twin County Hospital

40.     Once Mr. Smith arrived at the emergency room, he explained to Doctor A and Nurses B, C, and D ("Medical Defendants") that his legs were "going in and out," and he was experiencing extreme pain in his neck, back, and legs.

41.     When Mr. Smith arrived at the hospital, he was weak, experienced about 50% loss of sensation in his legs, and struggled to stand without assistance.

42.     Despite the intensity of the pain that he was experiencing and the gravity of his symptoms, Mr. Smith was told by TCRH staff they believed Mr. Smith had arrived at the hospital seeking drugs and contrived his symptoms just to seek pain medication, and that there was nothing wrong with him.

43.     Medical Defendants then advised Mr. Smith that TCRH would refuse to provide him with medical treatment, despite his debilitating symptoms.

44.     Specifically, Mr. Smith was told that Twin County Hospital's reason for refusing to treat him was because the Medical Defendants knew of his previous opioid use through the Hospital's pain management program in 2008 and 2009.

45.     Substance use disorder is a disability that affects about 10 percent of the U.S. population.[3]

46.     Frustrated and scared, Mr. Smith told Medical Defendants that he was not seeking pain medication, and that he was at the hospital because he was in extreme pain and was rapidly losing the functioning of his legs.

47.     His cries for help were repeatedly ignored, downplayed, and belittled by TCRH staff as his pain continued to worsen and Mr. Smith's fear of permanent damage to his legs, back

---

[3] Press Release, National Institutes of Health, *10 percent of US adults have drug use disorder at some point in their lives* (Nov. 18, 2015), https://www.nih.gov/news-events/news-releases/10-percent-us-adults-have-drug-use-disorder-some-point-their-lives [https://perma.cc/ZN2G-RZJM].

and neck increased. Instead, Medical Defendants insisted that Mr. Smith did not need medical assistance because he was, in their eyes, an addict.

48.     Medical Defendants provided only a shot of Benadryl to Mr. Smith, and—instead of treating his loss of limb function—catheterized him to perform a urine drug test.

49.     Medical Defendants knew that Mr. Smith's reports of the loss of his lower body functioning were true—indeed, they only had to use a catheter to conduct a urine drug test because he was unable to stand or control the lower half of his body.

50.     Instead of providing medical care, Medical Defendants told Mr. Smith that they wanted him removed from the hospital. As a result of a policy, practice, or custom of ongoing coordination between Twin County Hospital and the Carroll County Sheriff's Office, a Sheriff's Deputy ("Deputy V") was contacted, and hospital personnel coordinated with the Deputy to facilitate Mr. Smith's arrest.

51.     Deputy V became aware of a 2015 charge for "failure to appear" for a probation violation against Mr. Smith.

52.     Mr. Smith's outstanding failure to appear was over four years old, for a nonviolent offense. There was no legitimate reason to prioritize facilitating Mr. Smith's arrest over treating his emergent medical issues, including rapid loss of limb functioning.

53.     Defendant Nurses B, C, and D informed Mr. Smith that he was being discharged from the Hospital. Deputy V, with assistance from Nurses B, C, and D, tore Mr. Smith out of his hospital bed in an attempt to make him stand and, when he was unable to stand, they dragged him into a wheelchair and took Mr. Smith outside.

54.     Plaintiff did not receive notice that the police had been called.

55.     Defendant Deputy V brought Mr. Smith, who was at this point weak and sedated, into his car using physical force.

**D.  Arbitrary and Purposeless Denial of Due Process against Mr. Smith**

56.     Deputy V transported Mr. Smith to the Carroll County General District courthouse for a bond hearing at a local magistrate's office at approximately midnight.

57.     Mr. Smith pleaded for medical attention while Deputy V drove him to the magistrate's office, but he was ignored.

58.     As a result of a Carroll County Sheriff's Office policy, practice, custom, or lack thereof, Deputy V did not provide Mr. Smith with appropriate medical treatment despite Mr. Smith's emergency medical condition, nor take appropriate precautions to ensure that Mr. Smith's medical condition would not be exacerbated by Mr. Smith's removal from the hospital and transportation to the magistrate's office.

59.     Because Mr. Smith had limited control over his legs, he could not exit the police car unassisted once he arrived at the magistrate's office.

60.     Deputies W, X, and Y joined Deputy V, and together they forcefully pulled Mr. Smith from the car.

61.      As a result of a Carroll County Sheriff's Office policy, practice, custom, or lack thereof, Deputies V–Y failed to take appropriate precautions or care when moving or physically touching Mr. Smith, an individual in the middle of a medical emergency.

62.     Unable to support his own weight, Mr. Smith fell to the ground. The four deputies violently pulled him up by his neck and under his shoulders, and Mr. Smith again fell on the concrete.

63.     The four deputies began to physically drag Mr. Smith on a rubber welcome mat, all while berating him. They called him a "piece of shit junkie," and told Mr. Smith he'd just "shot up some bad dope."

64.     Other than the Benadryl he had received at the hospital, Mr. Smith had not taken any drugs, and there was no reason to believe he was under the influence of drugs.

65.     Mr. Smith pleaded that he needed medical attention. He again emphasized that he could not use his legs, and urgently needed the attention of a doctor.

66.     Instead of providing the emergency medical services Mr. Smith desperately needed, Defendant Deputies V–Y forcibly threw Mr. Smith down onto a rubber mat and dragged him into the courthouse building and down its halls to the magistrate's office.

67.     Because of a Carroll County Sheriff's Office practice or lack thereof, Deputies V–Y did not take appropriate precautions or action to ensure that their treatment of Mr. Smith would not exacerbate his medical condition or cause him harm.

68.     In an attempt to force him to stand, Defendant Deputies V–Y repeatedly pulled Mr. Smith up, gripping his neck and under his shoulders where he was experiencing extreme pain, and dropped him. Mr. Smith repeatedly fell to the ground while the deputies verbally harassed him. At no point did Defendant Deputies V–Y attempt to break his fall or catch him to prevent further injury.

69.     Mr. Smith was in such great pain from the deputies repeatedly grabbing him by the shoulders and dropping him to the ground that he began to sob in front of the Deputies. In response, the Deputies continued to forcibly drag him up and drop him to the ground.

70.     The Deputies brought Mr. Smith before Defendant Judge F while Mr. Smith continued to cry out in pain and plead for medical help.

71.     The Deputies presented a speech to Judge F about Mr. Smith, frequently referring to his substance use disorder to influence the judge's view.

72.     Defendant Judge F told Mr. Smith that he had been transported to the office from the Emergency Room due to his 2015 failure-to-appear charge. He told Mr. Smith that the exchange between the two would determine whether Mr. Smith would be taken to jail, or whether Mr. Smith would be able to go home on bond.

73.     Upon seeing that Mr. Smith could not stand, Defendant Judge F told Mr. Smith: "If you can stand up and talk to me like a man, you can go home."

74.     Because of Mr. Smith's present neurological function and inability to use his legs —consequences of his disability—Mr. Smith was unable to comply with Defendant Judge F's requirement for bond.

75.     Mr. Smith remained on the floor in Defendant Judge F's office, and Defendant Judge F told him, "we know you're faking this," and called him a "junkie." He then denied Mr. Smith bond because he could not stand up.

76.     The exchange at Judge F's office lasted about forty-five minutes, during which time Deputies V–Y repeatedly forcibly lifted Mr. Smith off of his limp legs and dropped him to the ground.

77.     After Mr. Smith was denied bond, Deputies V–Y shackled Mr. Smith's hands— which were entirely numb—to his waist, and then shackled his ankles together.

78.     The four deputies picked Mr. Smith up by his newly affixed chains and by his clothing, and violently dragged him on the ground, through the office, back to the curb outside.

79.     There was a police van waiting for the group, and Deputy Z was waiting to drive Mr. Smith to the jail.

80.     Mr. Smith's mobility was already significantly impaired, and he was losing consciousness. Now shackled, Mr. Smith was entirely unable to walk or otherwise move to the police van.

81.     Deputies V–Y continued to mock Mr. Smith for being a "junkie" instead of providing life-saving medical care.

82.     Deputies V–Y together threw Mr. Smith into the back of the police van. The four deputies grabbed Mr. Smith's clothing, lifted him off the ground, and swung him back and forth to gain momentum.

83.     Because of his limited mobility, it took the deputies multiple attempts to succeed in throwing Mr. Smith into the van.

84.     Mr. Smith's hands were shackled to his waist, so he had no means to brace himself or to protect his head and neck from the impact of the throws.

85.     Each throw was excruciating for Mr. Smith. As Mr. Smith's body was repeatedly slammed into the bumper, doors, and back of the van, the pain in his legs and back burned, and—because the deputies were throwing Mr. Smith headfirst into the van—introduced new, terrifying shock waves of pain through his head and neck.

86.     Eventually, Deputies V–Y were able to throw him hard enough, and they threw Mr. Smith into the back of the police van headfirst, where he slammed into the floor. Mr. Smith was left lying on his back and unable to sit on the bench in the back of the van.

87.     One of the deputies told him that if Mr. Smith was going to "fake" his legs not working, he could just "lay there."

88.     The Deputies did not secure Mr. Smith, but rather left him unsecured and on his back on the floor of the van.

89.     The Deputies slammed the back of the van shut, and left Mr. Smith alone, in the dark, overwhelmed by pain, and terrified for his health and safety.

**E.  Brutal Rough Ride in Police Transport Vehicle**

90.     As Mr. Smith would eventually learn, Deputy Z was driving him more than 40 minutes away, to the New River Valley Regional Jail in Dublin, Virginia.

91.     As Deputy Z drove toward the jail, he hit various potholes, cracks, and bumps in the pavement that threw Mr. Smith, who was laying unsecured on the metal floor of the van, from one side of the van to the other.

92.     Despite having Mr. Smith unsecured and moaning in pain in the back of the van, Deputy Z drove erratically, and every sharp corner or turn threw Mr. Smith across the floor.

93.     Mr. Smith was weak, and his back and his spine were in a fragile, delicate state. Each van shift, and each crack in the pavement sent excruciating waves of pain through his body.

94.     Mr. Smith alerted the Deputy to his pain, and he continued to plead for medical help because he was unable to use his legs. Mr. Smith asked Deputy Z several times to avoid hitting bumps. In response, Deputy Z *accelerated* the van and turned up the music in the van to drown out Mr. Smith's pleas.

95.     Despite knowing the vulnerability of Plaintiff's medical condition, Defendant Deputy Z continued to drive the transport vehicle with wanton disregard for his safety.

96.     Deputy Z continued to exacerbate his pain and underlying medical condition. Because of a Carroll County Sheriff's Office practice or lack thereof, Deputy Z did not take appropriate precautions or action to ensure that their transportation of Mr. Smith would not exacerbate his medical condition or cause him physical harm while Mr. Smith was in their custody

and under their direct control, such as securing him during the ride or refraining from a rough ride while a medically vulnerable person was on the floor in the back of the van.

97.     At some point during the rough ride, Deputy Z accelerated over a particularly large bump on the road.

98.     As Deputy Z drove over the bump, the van jolted, Mr. Smith screamed out, and he felt a flash of pain, as if he had been shocked with a stun gun.

99.     In that moment, Mr. Smith irreparably and immediately lost all sensation in every part of his body, from his chest down.

100.     Mr. Smith tried to move his hands and legs, and realized that he was entirely immobile. He tried to move his fingers, and they were unresponsive.

101.     Shortly after being paralyzed on the floor of the police van, Mr. Smith lost consciousness.

### F.  Delay of Medical Treatment at New River Valley Regional Jail

102.     Mr. Smith next awoke face down on a concrete floor.

103.     He realized he was in a jail cell, alone. He was still in the clothes he wore to the hospital.

104.     He could not move, and could barely breathe. He tried to yell for help, and could not expand his lungs enough to raise his voice or speak.

105.     Mr. Smith lied there, face down and alone, for several hours.

106.     Eventually, when one of Jail Officers 1, 2, or 3 brought him breakfast, Mr. Smith tried to communicate that he was paralyzed and in desperate need of help.

107.     One of Jail Officers 1, 2, or 3 had to come close to Mr. Smith to hear him, as he was barely breathing and unable to raise his voice above a whisper.

108.     Despite the fact that Mr. Smith was immobile, facedown, and barely breathing, Jail Officers 1, 2, and 3 ignored his pleas, left him on the floor of the cell, and shut the window through which they put his food.

109.     As a result of a NRVRJA policy, practice, custom, or lack thereof, Jail Officers 1, 2, and 3 failed to adequately ensure that Mr. Smith did not require immediate medical assistance, did not take steps to mitigate his existing medical condition, and did not provide or facilitate the immediate care or assistance that Mr. Smith required.

110.     Hours after leaving breakfast in Mr. Smith's cell, a correctional officer and a nurse making rounds returned and noticed that Mr. Smith was still face down on the same spot on the floor.

111.     At this point, Mr. Smith had been paralyzed and barely breathing for several hours.

112.     It was only then that the correctional officer and nurse called for medical attention from the jailhouse nurse.

113.     The nurse immediately recognized that Mr. Smith was in critical condition, having difficulty breathing, and likely paralyzed. She expressed shock that Mr. Smith had not received medical attention sooner, as he was clearly undergoing a medical emergency.

114.     Mr. Smith was rushed to Carilion New River Valley Medical Center, where he was immediately intubated to help him breathe. As soon as he was stable, he was transported to Carilion Roanoke Memorial Hospital ("Roanoke Hospital"), where he was forced to undergo emergency surgery to try to address infection and salvage the nerves in his spine.

### G. Forced Judicial Proceedings from Hospital Bed

115.     Mr. Smith awoke in Roanoke Hospital after emergency surgery. Looking around, he realized he was shackled to his bed, and Doe Officer 4 or 5 was stationed in his room. He could not communicate because he was intubated and unable to move his hands.

116.     During all times where Mr. Smith was not actively on the operating table, Defendant Doe Officers 4 and 5 insisted that he be shackled to his hospital bed, despite the Roanoke Hospital nurses complaining that this impeded his care.

117.     Between five and six days after he awoke, Mr. Smith was required to appear for a bond hearing on or around May 10. The nurses at Roanoke Hospital pleaded with the Defendant Doe Officers 4 and 5 not to force Mr. Smith to appear at a bond hearing from his hospital bed because he was on a ventilator, unable to speak, and heavily sedated.

118.     Instead, as Mr. Smith lay motionless in his hospital bed, intubated and sedated, one of Defendant Doe Officers 4 or 5 placed an iPad in front of Mr. Smith's face and proceeded with the bond hearing.

119.     The magistrate judge overseeing Mr. Smith's bond hearing told Mr. Smith to blink or nod his agreement during the hearing. He was released on his personal recognizance.

120.     The magistrate judge overseeing the bond hearing on or about May 10th advised Mr. Smith to set a future hearing date when he was physically able to do so.

121.     Mr. Smith remained intubated in Roanoke Hospital for approximately 50 days, and remained in his hospital bed recovering for about three to four months in total.

122.     Mr. Smith has not been physically able to reset a hearing date. Instead, he has spent the last two years incapacitated and receiving hospital treatment for his quadriplegia.

123.     Mr. Smith was told at Roanoke Hospital that if Doctor A and Nurses B, C, and D had conducted simple tests at the Twin Valley Hospital Emergency Room, such as an MRI or a

CT scan, they could have identified the life-threatening abscess on his upper spine. Mr. Smith's neck and shoulder pain and the numbness in his hands and legs were symptoms of such an abscess, and had it been identified, he could have been treated.

**H. Mr. Smith's Permanent Incapacitation and Trauma**

124.    Mr. Smith later learned that his immobility was caused by an abscess on his C6 vertebra, which controls lower body functioning such as breathing, walking, and bowel movements.

125.    The abscess on Mr. Smith's C6 vertebra ruptured—permanently paralyzing Mr. Smith—due to the force placed on his neck and spine while in custody.

126.    Mr. Smith now lives permanently in long-term care facilities. He is permanently paralyzed from his chest down and will never regain the use of his legs. His paralysis has stripped him of his ability to enjoy a normal quality of life, function independently, and interact with his family as before his incapacitation.

127.    As a result of the horrific events on or around May 3 and 4, 2020, Mr. Smith has a deeply rooted terror and fear of law enforcement. Every day of Mr. Smith's life as a quadriplegic serves as a reminder of how deputies ignored his pleas for help and treated him with such violence that he suffered a complete spinal injury. His immobilization will afflict him for the remainder of his life, and he depends on third persons for daily care, including feeding, cleaning, and bathing.

128.    Mr. Smith's physical ailments have also inflicted severe emotional harm. He suffers on a daily basis from insomnia which significantly impairs his ability to sleep. Averaging approximately a couple hours each night, Mr. Smith suffers from the debilitating nature of this ailment that practically renders him void of any energy. His insomnia is attributed to heightened

anxiety, nightmares, and a number of other psychological ailments he has developed in connection with the events on or around May 3, 2020.

129.    Specifically, he frequently dreams that he is in a jail cell and cannot breathe, and wakes up in a state of panic.

130.    Mr. Smith's long-term care and treatment has also presented a significant burden and emotional toll on those tasked with tending to his health, including his fiancée and children. They have collectively shared in the trauma he has endured since May 2020.

131.    Deputies V–Z used their position of power as officers of the law to blatantly intimidate Mr. Smith and issue verbal and physical attacks upon him without any ability on his end to defend himself.

132.    Mr. Smith's emotional distress is significant. Each day, Mr. Smith must live with the fact that he can no longer use his body, and he struggles with the trauma of being brought to the brink of death because of Defendants' behavior.

### IV.    CLAIMS

**First Claim for Relief: Excessive Use of Force Against Plaintiff**
Against Defendants Deputies V–Z and Sheriff Kevin A. Kemp
*Fourth Amendment to the United States Constitution*

133.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

134.    Defendant Deputies V–Z acted in reckless and conscious disregard for Mr. Smith's right to be free from unreasonable seizures, giving rise to a claim under 42 U.S.C. § 1983.

135.    Defendant Carroll County Sheriff Kevin Kemp failed to adequately train, supervise, and oversee its deputies. This, combined with its further failure to enforce and/or enact its own policies, practices, and procedures, led to a custom and practice of widespread and illegal excessive

use of force, including through the practice of "rough rides," by CCSO deputies. Moreover, Kemp knew or should have known that CCSO deputies and the New River Valley Regional Jail staff commonly use excessive force but failed to address these widespread violations of individuals' Fourth Amendment rights. These failures give rise to a further claim under 42 U.S.C. § 1983.

136.    At all times herein, Defendant Deputies V–Z acted under the color of state law and their conduct subjected Mr. Smith to the deprivation of his Fourth Amendment rights secured by the Constitution of the United States.

137.    The restraints Defendant Deputies V–Z placed on Mr. Smith constituted excessive force because he never posed an immediate threat to the safety of deputies or others given his limited use of his legs.

138.    The restraints Defendant Deputies V–Z placed on Mr. Smith served no penological interests because he could not move at any point and thus was not a flight risk.

139.    Defendant Deputies V–Z used unreasonable and excessive force when Deputies V–Z attempted to force Mr. Smith to stand up by picking him up and dropping him at the magistrate's office, despite the fact that Mr. Smith was crying out in pain.

140.    Defendant Deputies V–Z used unreasonable and excessive force when following Mr. Smith's appearance in front of Judge F, Deputies V–Z again attempted to force Mr. Smith to stand by repeatedly picking him up and dropping him.

141.    Defendant Deputies V–Z used unreasonable and excessive force when they picked Mr. Smith up horizontally and threw him into the back of the police van headfirst.

142.    Defendant Deputies V–Z failed to prevent state-created danger when they did not secure Mr. Smith with a seatbelt or help him to sit upright.

143.     Defendant Deputies V–Z used unreasonable and excessive force when they drove recklessly and erratically, subjecting Mr. Smith to a "rough ride." This was particularly painful and dangerous for Mr. Smith because he had come into the emergency room earlier that evening with head and neck pain already.

144.     Defendant Deputies V–Z used unreasonable and excessive force when they put Mr. Smith into his jail-cell facedown despite the fact that they had knowledge that he could not use his legs.

145.     The whole of Defendant Deputies V–Z's conduct was unwarranted, unjustified, and an unconstitutional excessive use of deadly force.

146.     The actions of Defendant Deputies V–Z were the direct and proximate cause of the violations of Mr. Smith's constitutional rights and of the damages suffered by Mr. Smith including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

<u>**Second Claim for Relief: Violation of Substantive Due Process**</u>
Against State-Actor Defendants
*Fourteenth Amendment to the United States Constitution*

147.     Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

148.     Plaintiff has a clearly established right under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from deprivations of his liberty without due process of law.

149.     Defendants NRVRJA and Carroll County Sheriff Kevin A. Kemp failed to adequately train, supervise, and oversee their deputies. This, combined with their further failure to enforce their own policy guidelines, led to a custom and practice of widespread and illegal denial of necessary medical treatment for pretrial detainees, aggravated through the practice of "rough

rides," by CCSO deputies. Moreover, Sheriff Kemp knew or should have known that CCSO deputies commonly delay medical treatment but failed to address these widespread violations of individuals' Fourth Amendment rights. These failures give rise to a further claim under 42 U.S.C. § 1983.

150.    Plaintiff has a fundamental interest in his bodily integrity that is deeply rooted in the nation's tradition and implicit in the concept of ordered liberty.

151.    Deputies V–Z made a deliberate choice from among various alternatives to deprive Mr. Smith of his fundamental liberty interest in bodily integrity.

152.    At all times relevant herein, State-Actor Defendants acted under color of state law pursuant to the Commonwealth of Virginia's executive and judicial authority.

153.    When individuals act under color of state law, they have a duty to provide medical care and reasonable safety to people in the state's custody, and to refrain from affirmatively placing people in state-created danger.

154.    As soon as Deputy V took custody of Plaintiff outside the emergency room of Twin County Regional Healthcare, he had a duty to provide medical care and reasonable safety to him.

155.    Defendants' reckless driving affirmatively placed Plaintiff in state-created danger.

156.    When Deputies V–Z brought Plaintiff to the New River Valley Regional Jail, they failed to ensure that the facility's deputies handled Plaintiff safely, causing him to be left face down in a cold jail cell.

157.    Defendants' treatment of Plaintiff proximately caused the rupture of an epidural abscess at Plaintiff's C-6 vertebra.

158.    Defendants' treatment of Plaintiff proximately aggravated any pre-existing injuries.

159.    As a result of the Defendants' conduct, Plaintiff no longer has any motor functions and has been rendered quadriplegic.

160.    As a result of the Defendants' conduct, Plaintiff depends on third persons for daily care, including feeding, cleaning, and bathing.

161.    As a result of the Defendants' conduct, Plaintiff is permanently quadriplegic.

162.    The behavior of the Defendants is so egregious and outrageous that it may fairly be said to shock the contemporary conscience.

163.    The aforementioned behavior cannot be said to serve any penological interest or to operate neutrally.

164.    Deputies V–Z and Jail Officers 1, 2, and 3 violated Plaintiff's fundamental and deeply rooted liberty interest in bodily integrity when they failed to provide medical attention to Plaintiff, resulting in his paralysis from the chest down.

165.    These actions constitute a violation of substantive due process under the Fourteenth Amendment to the U.S. Constitution.

### Third Claim for Relief: Violation of Procedural Due Process
*Against State-Actor Defendants and Doe Officers 4 and 5*
*Fourteenth Amendment to the United States Constitution*

166.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

167.    Plaintiff has a clearly established right under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from deprivations of his liberty without due process of law.

168.    The conduct of the State-Actor Defendants against Plaintiff in the course of his seizure deprived his liberty interests without due process of law.

169.     At all times relevant herein, State-Actor Defendants acted under color of state law pursuant to the Commonwealth of Virginia's executive authority.

170.     State-Actor Defendants made a deliberate choice from among various alternatives to deprive Mr. Smith of due process protections.

171.     State-Actor Defendants did not provide Plaintiff with adequate procedural protections before depriving him of his liberty interest.

172.     The private liberty interest in bodily integrity has been held "sacred" and a "cherished value of our society" by the Supreme Court.[4]

173.     The risk of erroneous deprivation of Plaintiff's liberty interest through the procedures used was high.

174.     The Government had a minimal interest in depriving Plaintiff of liberty without due process, and the fiscal and administrative burdens that additional or substitute procedural safeguards were also minimal.

175.     State-Actor Defendants did not provide Plaintiff with sufficient notice or information about the charges against him.

176.     At no point during these events was Plaintiff made aware of his right to contact an attorney, and he went through these proceedings without legal representation.

177.     After forcing him to leave the hospital and forgo medical care, Deputies V–Y failed to provide Plaintiff with adequate notice that he would be brought before a Magistrate Judge to defend himself at a bail hearing in the middle of the night.

---

[4] *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."); see also *Schmerber v. California*, 384 U.S. 757, 772 (1966) ("The integrity of an individual's person is a cherished value of our society.").

178.    At no point during these proceedings did Deputies V–Z have authority to mete out punishment to Plaintiff, because he had not been convicted of a crime.

179.    The brutality of the actions of Deputies V–Z against Plaintiff, including the forced dragging, rough ride, and unreasonable detention, demonstrate that they were taken with an express intent to punish.

180.    The conditions on Plaintiff's confinement at the New River Valley Regional Jail were not reasonably related to any legitimate government goal.

181.    The violent treatment of Deputies V–Z toward Plaintiff, on the whole, constituted arbitrary and purposeless deprivations of liberty.

182.    Even though Plaintiff could not move because he was sedated and paralyzed, one or more of Doe Officers 4 and 5 continued to physically restrain him by shackling him to his own hospital bed, violating his liberty interest in bodily integrity.

183.    Approximately six days after Plaintiff had to undergo life-saving emergency surgery to treat the epidural abscess in his spinal cord, Doe Officers 4 and 5 required him to appear before another judge for a hearing even though he could not meaningfully participate in it.

184.    Defendants forced Plaintiff to attend a remote hearing by holding an iPad in front of his face even though he was heavily sedated, slipping in and out of consciousness, and unable to speak due to intubation as part of his recovery.

185.    These physical conditions prevented Plaintiff from articulating his own defense during the hearing. In fact, Plaintiff could only participate in the hearing and communicate with the judge by the blinking of his eyes and nodding of his head.

186.    These actions constitute a violation of procedural due process under the Fourteenth Amendment to the U.S. Constitution.

**Fourth Claim for Relief: Violation of the Americans with Disabilities Act**
Against Deputies V–Z, Sheriff Kevin A. Kemp, and Medical Defendants
*42 U.S.C. § 12101, et seq.*

187.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

188.    Plaintiff states this cause of action against Deputies V–Z in their official capacities.

189.    Since 2004, Plaintiff has had a substance use disorder that substantially limits his major life activities, including thinking, communicating, eating, walking, breathing, and working.

190.    Plaintiff also suffers from osteomyelitis, sciatic nerve damage, and degenerative disk disease as a result of a previous spinal surgery.

191.    Plaintiff is a qualified individual with a disability as defined in 42 U.S.C. §12102.

192.    Plaintiff is entitled to be free from discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. *See* 42 U.S.C. § 12182.

193.    Twin County Regional Healthcare is a place of public accommodation as defined in 42 U.S.C. § 12181(7)(F).

194.    TCRH and its staff discriminated against Plaintiff on the basis of negative stereotypes associated with his disability by denying him adequate medical care.

195.    TCRH and its staff discriminated against Plaintiff on the basis of negative stereotypes associated with his disability by refusing to conduct tests to determine an appropriate medical course of treatment.

196.    TCRH and its staff discriminated against Plaintiff on the basis of negative stereotypes associated with his disability by discharging him prematurely into the custody of law enforcement even though he still had urgent, untreated medical symptoms.

197.    Plaintiff is entitled not to be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity, on the basis of disability. See 42 U.S.C. § 12132.

198.    The courthouses and jails that Plaintiff appeared in at all times relevant to this action are public entities as defined in 42 U.S.C. § 12131.

199.    Plaintiff, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the participation in proceedings by these public entities.

200.    Defendants Deputies V–Y failed to provide reasonable accommodations for Mr. Smith to appear before a judicial proceeding.

201.    Defendants Deputies denied Mr. Smith the opportunity to participate in his own defense before a judicial proceeding.

202.    The actions undertaken by Defendants constitutes discrimination on the basis of a disability that prevented Mr. Smith from equally accessing medical and public services.

### Fifth Claim for Relief: Violation of the Americans with Disabilities Act
Against Defendants Judge F and Karl Hade
*42 U.S.C. § 12101, et seq.*

203.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

204.    Plaintiff states this cause of action against Judge F in his official and individual capacities.

205.    Plaintiff states this cause of action against Karl Hade in his official capacity.

206.    Since 2004, Plaintiff has had a substance use disorder that substantially limits his major life activities, including thinking, communicating, eating, walking, breathing, and working.

207.    Plaintiff also suffers from osteomyelitis, sciatic nerve damage, and degenerative disk disease as a result of a previous spinal surgery.

208.    Plaintiff is a qualified individual with a disability as defined in 42 U.S.C. § 12102.

209.    Plaintiff is entitled to equal access to public services, including courthouses and detention facilities. The Office of the Executive Secretary of the Supreme Court of Virginia has a duty to comply with the requirements of Title II of the ADA and make all reasonable modification to policies and programs to ensure that people with disabilities have an equal opportunity to enjoy all of its programs, services, and activities.

210.    Judge F denied Plaintiff the ability to defend himself in a judicial proceeding by conditioning the outcome of his hearing on an activity that Plaintiff could not complete because of his disability.

211.    Judge F denied Plaintiff equal access to the courts by forcing him to lie on the floor for the duration of the hearing.

212.    Judge F denied Plaintiff equal access to the courts when he failed to provide a reasonable accommodation for seating at the hearing, such as a wheelchair or a chair.

213.    At all times relevant to the events herein, Judge F acted outside all jurisdiction because he abandoned his judicial duties when he conditioned bail on an action that Plaintiff, because of his disability, could not take.

214.     Defendant Karl Hade failed to comply with the requirements of Title II of the ADA by failing to make all reasonable modifications to policies, practices, and programs to ensure that people with disabilities have an equal opportunity to enjoy all of its programs, services, and activities. *See* Va. Code. 17.1-315.

215.     The actions undertaken by Defendants constitutes discrimination on the basis of disability that prevented Mr. Smith from equally accessing public services.

**Sixth Claim for Relief: Violation of the Patient Protection and Affordable Care Act**
Against Defendant Twin County Regional Healthcare
*42 U.S.C.A. § 18116*

216.     Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

217.     Plaintiff has a clearly established right under the Patient Protection and Affordable Care Act ("PPACA") to not be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity, any part of which is receiving federal financial assistance, on the basis of his disabilities.

218.     Defendant Twin County Regional Healthcare ("TCRH") receives federal financial assistance for health programs.

219.     Plaintiff has substance use disorder, osteomyelitis, sciatic nerve damage, and degenerative disk disease.

220.     Plaintiff's conditions are qualifying disabilities under the PPACA and relevant statutes.

221.     Defendant TCRH denied Plaintiff the benefit of health care when Defendant TCRH refused to treat the loss of sensation in his legs and the extreme pain in his neck, back, and legs.

222.     Defendant TCRH discriminated against Plaintiff when declining to provide him necessary health care.

223.     Defendant TCRH denied Plaintiff health care because Defendant TCRH alleged Plaintiff was seeking pain medication for his substance use disorder.

224.     Defendant TCRH denied Plaintiff the benefits of health care and discriminated against him on the basis of his disability when Defendant TCRH refused to treat the loss of sensation in his legs and extreme pain in his neck, back, and legs because he has suffered from substance use disorder in the past.

### Seventh Claim for Relief: Medical Malpractice
Against Medical Defendants
*Va. Code § 8.01-581.1*

225.     Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

226.     Virginia law imposes a duty of care on medical staff and personnel to protect the health and safety of persons in their care, including those persons who come into their emergency rooms with urgent medical needs.

227.     Defendant Twin County Regional Hospital is a health care provider as defined by the Virginia Medical Malpractice Act. *See* Va. Code Ann. § 8.01-581.1.

228.     Doctor A and Nurses B, C, and D, who are employed by and provide medical services at Twin County Regional Hospital, are health care providers as defined by the Virginia Medical Malpractice Act. *See id.*

229.     At all times relevant herein, Twin County Regional Hospital and Doctor A and Nurses B, C and D had an affirmative duty to provide Mr. Smith with appropriate medical care and treatment in a manner consistent with Virginia law and the prevailing standards of care.

230.     The acts and omissions herein constitute violations of the standards of care with respect to Mr. Smith by persons licensed by the Commonwealth of Virginia to provide healthcare as physicians and nurses.

231.     Medical Defendants breached their duties of care by not adequately treating Mr. Smith's neck, back and leg pain and by not investigating the extent of his injuries and the source of his pain despite his repeated assertions that the pain was urgent and worsening.

232.     Medical Defendants breached their duties of care by determining the appropriate treatment for Mr. Smith based on the incorrect assumption that he was seeking pain medication as a result of addiction, rather than basing his treatment on the symptoms that he was presenting, the policies of the hospital, and the prevailing standard of care for emergency room patients.

233.     Medical Defendants breached their duties of care by failing to provide adequate medical care to Mr. Smith.

234.     Medical Defendants breached their duties of care by failing to adequately examine Mr. Smith's potential injuries.

235.     Medical Defendants breached their duties of care by dragging Mr. Smith out of his hospital bed and transferring his custody to the police in the middle of a serious medical emergency without completing a full examination or ensuring that Mr. Smith was stable enough to be moved.

236.     The negligence of the Medical Defendants proximately caused Mr. Smith's injuries; as a result, Mr. Smith will never regain the function of his limbs, nor will he be able to care for his own basic needs; an outcome that was entirely preventable had Mr. Smith received adequate medical care.

237.     The failures of Medical Defendants to meet the standards of care were the proximate cause of Mr. Smith's injuries.

238.    The actions or omissions described herein constitute the tort of medical malpractice under the laws of the Commonwealth of Virginia.

### Eighth Claim for Relief: Battery
Against Deputies V–Z and Carroll County Sheriff Kevin A. Kemp
*Virginia Common Law*

239.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

240.    At all times relevant to this case, Defendant Deputies V–Z acted within the scope of their employment duties and their conduct is thus imputable to the Carroll County Sheriff's Office.

241.    In performing the acts described herein, Defendants Deputies V–Z willfully touched Mr. Smith's person.

242.    Defendant Deputies V–Z inflicted bodily harm on Mr. Smith's person. Specifically, when deputies forcefully touched Mr. Smith while under police custody which included rough grabbing of Mr. Smith's body with the attempt of exacerbating and worsening his escalating physical pain and then subsequently throwing Mr. Smith in the back of a police van which gave way to the loss of function and feeling in his legs.

243.    Defendant Deputies V–Z had a harmful intent when this behavior was commenced on or around May 3, 2020, given the utterance of offensive language such as calling Mr. Smith a "junkie," telling him to "stand up like a man" and using aggressive physical contact against him when he was helpless due to his ongoing medical emergency.

244.    Mr. Smith did not consent to the Deputies' willful and harmful acts.

245.    The actions described herein constitute the tort of battery under the laws of the Commonwealth of Virginia.

### Ninth Claim for Relief: Assault
Against Deputies V–Z and Carroll County Sheriff Kevin A. Kemp
*Virginia Common Law*

246.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

247.    At all times relevant to this case, Defendant Deputies V–Z acted within the scope of their employment duties and their conduct is thus imputable to the Carroll County Sheriff's Office.

248.    In performing the acts described herein, Defendant Deputies V–Z physically harmed Mr. Smith, and thus repeatedly intended to cause either harmful or offensive contact with Mr. Smith. Their repeated battery of Mr. Smith created reasonable apprehension of further imminent battery.

249.    Defendant Deputies V–Z had a present ability to inflict such harm given their position of power, total control and custody over Mr. Smith, and the lack of appropriate supervision during the course of the events on or around May 3, 2020.

250.    Mr. Smith was in serious fear during the course of these events not only for the condition of his health, loss of sensation in his legs, but also for his life.

251.    Mr. Smith did not consent to the Deputies' willful and harmful acts.

252.    The actions described herein constitute the tort of assault under the laws of the Commonwealth of Virginia.

### Tenth Claim for Relief: Negligence
Against Jail Officers 1–3 and NRVRJA.
*Virginia Common Law*

253.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

254.     At all times relevant to this case, Jail Officers 1–3 acted within the scope of their employment duties and their conduct is thus imputable to the NRVRJA.

255.     Jail Officers 1–3 had duties to exercise reasonable care with regard to Plaintiff.

256.     Jail Officers 1–3 breached their duties to exercise reasonable care with regard to Plaintiff when they ignored his pleas for help and left him on the floor of the cell for hours, unable to breathe normally or speak.

257.     Jail Officers 1–3 were aware of their conduct and also were aware, from knowledge of existing circumstances and conditions, that their conduct would result in injury to Plaintiff.

258.     As a direct and proximate result of the negligence of Jail Officers 1–3, Plaintiff suffered further injuries, great physical pain, severe emotional distress, and mental anguish.

### Eleventh Claim for Relief: Intentional Infliction of Emotional Distress
Against Deputies V–Z and Carroll County Sheriff Kevin A. Kemp
*Virginia Common Law*

259.     Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

260.     At all times relevant to this case, Defendant Deputies V–Z acted within the scope of their employment and their conduct is thus imputable to the Carroll County Sheriff's Office.

261.     Defendant Deputies V–Z intentionally and recklessly caused Mr. Smith to suffer severe emotional distress by uttering a variety of verbal insults at Mr. Smith which included calling him a "junkie," undermining the imminent and severe status of his medical condition by saying that he was just "faking it," placing him in custody without any supported or verbalized set of charges, rendering him powerless and unable to defend himself against authority, leaving him without any medical attention as Mr. Smith adamantly asserted that he was losing feeling in his legs, and keeping him in the totality of these conditions for a matter of hours while he lay without

urgently needed medical treatment, any loved ones being notified of his whereabouts, and not having a clear understanding of his constitutional rights or access to counsel.

262.    The conduct of Defendant Deputies V–Z was outrageous and intolerable and a violation of their duties as peace officers to uphold and enforce the law.

263.    Defendant Deputies V–Z maliciously used the power dynamic of officer-to-detainee to instill fear, to insult, and to deny cries for help as Mr. Smith suffered a significant spinal injury.

264.    The behavior of the Defendant Deputies V–Z on or around May 3, 2020 proximately caused long-term, life-altering mental and physical consequences for Mr. Smith. Mr. Smith now lives in utter fear of law enforcement, suffers from chronic depression and anxiety as a result of nearly dying in the custody of Defendant Deputies V–Z, and experiences on a daily basis the effects of insomnia.

265.    The stress Mr. Smith received from the collection of these events has directly caused the lingering mental side effects he currently experiences.

266.    The actions described herein constitute the tort of intentional infliction of emotional distress under the laws of the Commonwealth of Virginia.

### Twelfth Claim for Relief: Negligent Infliction of Emotional Distress
Against Deputies V–Z and Carroll County Sheriff Kevin A. Kemp
*Virginia Common Law*

267.    Plaintiff adopts and incorporates paragraphs 1 through 132 above as if fully set forth herein.

268.    At all times relevant to this case, Defendant Deputies V–Z acted within the scope of their employment and their conduct is thus imputable to the Carroll County Sheriff's Office.

269.     Mr. Smith has suffered "fright and shock" from the events on or around May 3, 2020. From the totality of the brutal and emotional mistreatment Mr. Smith experienced at the hands of Defendant Deputies V–Z, he suffers from insomnia and panic attacks.

270.     Defendant Deputies V–Z, as trained law enforcement, should have known that purposefully and maliciously insulting Mr. Smith in an egregious way, coupled with physical brutality, would leave long-term emotional scarring on Mr. Smith and have the potential for a manifestation of physical side effects.

271.     The events on or around May 3, 2020, occurred under one continuous chain of traumatic events for Mr. Smith during his custody by Defendant Deputies V–Z. As a result of these connected totality of events, Mr. Smith now suffers severe physical and mental trauma.

272.     The actions described herein constitute the tort of negligent infliction of emotional distress under the laws of the Commonwealth of Virginia.

## DAMAGES

Plaintiff has suffered the following injuries for which he seeks full compensation under the law:

273.     Widespread physical injuries, including permanent spinal injury and paralysis, resulting from physical force and untreated medical conditions while in Defendants' custody;

274.     Recurring pain and suffering;

275.     Mental and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks the Court:

(a) DECLARE that Defendants' conduct violated the Fourth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, and the Patient Protection and Affordable Care Act;

(b) ENTER JUDGMENT holding the appropriate Defendants jointly and severally liable to

plaintiff for compensatory damages, punitive damages, and other damages recoverable

under the laws of the Commonwealth of Virginia;

(c) AWARD compensatory and punitive damages in an amount to be determined by a jury;

(d) AWARD Plaintiff his costs and reasonable attorney's fees; and

(e) GRANT such other and further relief as the Court deems just and proper.


Dated: May 3, 2022                                  Respectfully submitted,

                                                    */s/Aderson Francois*
                                                    Aderson Francois (D.C. Bar. No. 498544)
                                                    (*pro hac vice pending*)
                                                    Lucia Goin (D.C. Bar. No. 1739389)
                                                    (*pro hac vice pending*)
                                                    Marissa K. Hatton (D.C. Bar. No. 219291)
                                                    (*pro hac vice pending*)
                                                    CIVIL RIGHTS CLINIC
                                                    GEORGETOWN UNIVERSITY LAW
                                                    CENTER
                                                    600 New Jersey Avenue NW, Suite 352
                                                    Washington, DC 20001
                                                    (202) 661-6721
                                                    (202) 661-6506
                                                    (202) 662-9546
                                                    Aderson.Francois@georgetown.edu
                                                    Lucia.Goin@georgetown.edu
                                                    Marissa.Hatton@georgetown.edu

                                                    Alexis D. Grady
                                                    Henry J. Moseley
                                                    Jesus A. Rodriguez
                                                    Eric W. Taylor
                                                    CIVIL RIGHTS CLINIC
                                                    GEORGETOWN UNIVERSITY LAW
                                                    CENTER
                                                    600 New Jersey Avenue NW, Suite 352
                                                    Washington, DC 20001
                                                    *Student-Attorneys*

<u>/s/Joshua Erlich</u>
Joshua Erlich (VSB No. 81298)
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd. #700
Arlington, VA 22201
Tel: (703) 791-9087
Fax: (703) 722-8114
jerlich@erlichlawofice.com

*Counsel for Plaintiff*