**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**
Roanoke Division

| | | |
|---|---|---|
| JOSHUA LEE SMITH, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 7:22-cv-00238 |
| TWIN COUNTY REGIONAL HEALTHCARE, | ) | |
| *et al.*, | ) | **PLAINTIFF'S OPPOSITION TO** |
| | ) | **DEFENDANT KEVIN A.** |
| | ) | **KEMP'S MOTION TO DISMISS** |
| *Defendants*. | ) | |
| | ) | |

## INTRODUCTION

While experiencing a medical emergency and unable to stand or walk, Mr. Smith was subjected to excessive force and was deprived of due process as a consequence of Defendant Kemp's deliberate indifference to the unconstitutional behavior of his deputies. Mr. Smith alleges that Defendant Kemp's failure to train his deputies to adequately respond to emergency medical crises led to Mr. Smith's lifelong paralysis. Additionally, Mr. Smith has plausibly alleged that Defendant Kemp is liable for his failure to correct Carroll County deputies' known practices of unconstitutional behavior, including rough rides, withholding medical care, and taking those in custody to midnight bond hearings without access to a lawyer or knowledge of charges.

As a result of this outrageous treatment, Mr. Smith suffers from ongoing mental and physical trauma for which Defendant Kemp is both vicariously and directly liable. In his Motion to Dismiss, Defendant Kemp misrepresents the law in an attempt to minimize the severity of Mr. Smith's emotional distress and distorts the causal chain of events in an attempt to avoid Mr.

Smith's obvious physical injury—being rendered quadriplegic. Thus, Mr. Smith has successfully alleged Intentional Infliction of Emotional Distress (IIED), given the severity of his psychological symptoms, and Negligent Infliction of Emotional Distress (NIED), given that Defendant Kemp's negligence led directly to Mr. Smith's quadriplegia and stress-related physical harms.  Mr. Smith has developed severe anxiety, insomnia, depression, and constant fear. No longer able to use his body, Mr. Smith lives every day with the reminder of his near-death experience.

Defendant Kemp attempts to absolve himself of liability for the mistreatment that Mr. Smith endured at the hands of his officers by claiming entitlement to Eleventh Amendment immunity. However, he has failed to demonstrate that Virginia county sheriffs are considered an arm of the state for purposes of Eleventh Amendment immunity. Rather, looking to the consistent decrease in state oversight of Virginia county sheriffs over the past two decades, there is clear legislative intent to create distance between sheriffs such as Defendant Kemp and the Commonwealth. Current Virginia law indicates that county sheriffs are local, not state, officials. To take Defendant Kemp's assertion at its word would negate the considerable increase in autonomy that the Commonwealth has granted to county sheriffs and the counties they serve. Defendant Kemp has not provided any facts to show that a suit brought against him in his official capacity would implicate state liability. Nor has he demonstrated sufficient control over Carroll County sheriffs by the Commonwealth.

Defendant Kemp cannot use Eleventh Amendment immunity to shield himself from liability for Mr. Smith's claims of unconstitutional conduct arising under § 1983. Mr. Smith has sufficiently stated his claims arising under the Fourth and Fourteenth Amendments, the Americans with Disabilities Act, and those arising under Virginia law. Accordingly, this Court should deny Defendant Kemp's Motion to Dismiss.

## STANDARD OF REVIEW

When ruling on a motion brought pursuant to Rule 12(b)(6), this Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). While "the complaint must contain sufficient facts to state a claim that is plausible on its face, it nevertheless need only give the defendant fair notice of what the claim is and the grounds on which it rests." *Id.* A Rule 12(b)(6) motion to dismiss "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

When ruling on a motion brought pursuant to Rule 12(b)(1), a court must "view the alleged facts in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir.1999). Dismissal under Rule 12(b)(1) is proper "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999).

## ARGUMENT

This Court should deny Defendant Kemp's motion because (I) Defendant Kemp has failed to show he is immune to suit under the Eleventh Amendment, and he is better characterized as a municipal actor for Carroll County than an arm of the state, (II) a four-year statute of limitations applies to Mr. Smith's ADA claim, (III) Mr. Smith has stated a plausible claim for relief on the basis of Fourth Amendment and Fourteenth Amendment violations pursuant to Carroll County policy, and (IV) Mr. Smith has stated plausible claims for intentional infliction of emotional distress and negligent infliction of emotional distress.

I.   **Defendant Kemp Has Failed to Show He Is Entitled to Eleventh Amendment Immunity Because He Is Not an "Arm of the State" Under Virginia Law.**

Courts have "consistently refused to construe the Eleventh Amendment to afford protection to political subdivisions such as counties, even where such entities exercise a 'slice of state power,'" and Defendant Kemp, as the Carroll County sheriff, has not met his burden to show that he is a state government (rather than local county) official. *See Gray v. Laws*, 51 F.3d 426, 431 (4th Cir. 1995) (internal brackets omitted). Contrary to Defendant Kemp's framing of this issue as straightforward, in Virginia, whether suits against a county sheriff in his official capacity are suits against the Commonwealth is not a question that can be answered simply by looking at the state's on-paper characterization of county sheriffs. *See Gray*, 51 F.3d at 431 ("It is often difficult to determine whether a government entity with both state and local characteristics constitutes an 'arm of the state' for Eleventh Amendment purposes."). Instead, Virginia law determines whether Kemp, as a county sheriff, can be sued, and both the Virginia Supreme Court and federal district courts have devised multi-factor tests to determine whether a country sheriff can be considered a state official on a fact-dependent, case-by-case basis.[1] Importantly, "[c]ourts have long recognized, either explicitly or implicitly, that Virginia constitutional officers are capable of being sued." *Leuenberger v. Spicer*, No. 15-CV-00036, 2016 WL 355090, at *8 (W.D. Va. Jan. 28, 2016).

Defendant Kemp has not identified why his actions as a county official rise to the level of implicating the sovereign dignity of the Commonwealth, nor could he. The Supreme Court has identified, and the Fourth Circuit has recognized, that "the primary concerns that underpin the Eleventh Amendment [are] that federal court judgments not deplete state treasuries and that

---

[1] *See, e.g.*, *Weiner v. Albemarle Cnty.*, No. 17-CV-00046, 2018 WL 542979, at *3 (W.D. Va. Jan. 24, 2018) (looking to four factors to determine whether a Virginia commonwealth's attorney could be considered an "arm of the state" (citing *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136–37 (4th Cir. 2014))); *Blankenship v. Warren Cnty.*, 918 F. Supp. 970, 974 (W.D. Va. 1996) (citing *McCoy v. Chesapeake Correctional Center*, 788 F. Supp. 890 (E.D. Va. 1992)).

the sovereign dignity of the states be preserved." *Gray*, 51 F.3d at 431 (*citing Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994) (describing these as the "twin reasons" for state sovereign immunity)). "When indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain [the] prime guide." *Hess*, 513 U.S. at 47. These twin reasons weigh against finding that Defendant Kemp is entitled to state sovereign immunity.

First, the depletion of state treasuries is not automatically implicated in suits brought against sheriffs in their official capacity because judgments entered against state constitutional officers are covered by a *voluntary* insurance plan. VA. CODE ANN. § 2.2-1839(C) (2001) ("Participation [by constitutional officers] in the risk management plan shall be *voluntary* . . . ." (emphasis added)). Defendant Kemp does not assert or provide facts to establish that Carroll County sheriffs are enrolled in any state liability insurance plan, nor does he assert that the Commonwealth is in any way financially liable for monetary judgments entered against him as a county sheriff. Indeed, Virginia law instead dictates that "[i]n the event that any . . . sheriff . . . is made defendant in any civil action arising out of the performance of his official duties and does not have legal defense provided under the insurance coverage of his office . . . legal fees and expenses shall be paid from the treasury of the *county or city*." VA. CODE ANN. § 15.2-1606 (emphasis added). This provision makes clear that sheriffs do not enjoy blanket immunity from suit, for "[i]t is hard to believe that the General Assembly would go to the trouble—and expense— of providing for a legal defense for [individuals covered under § 15.2-1606] if they were not capable of being sued in the first place." *Leuenberger v. Spicer*, No. 15-CV-00036, 2016 WL 355090, at *8 (W.D. Va. Jan. 28, 2016). Defendant Kemp is not immune from suit on the basis of a depleted state treasury.[2]

---

[2] Even if Defendant Kemp was insured by the Commonwealth's voluntary insurance plan, the Virginia Supreme Court has made clear that the source of funding for his legal fees is only one of eight factors

Second, suit against Defendant Kemp does not implicate the "sovereign dignity of the states" pursuant to Virginia law, and extending principles of state sovereignty to completely immunize him from liability is inappropriate. The Virginia Supreme Court uses many of the same considerations enumerated in *Blankenship* in considering a government employee's claim to sovereign immunity—it "examine[s] the function [the] employee was performing and the extent of the state's interest and involvement in that function. Whether the act performed involves the use of judgment and discretion is a consideration, but it is not always determinative. . . . [o]f equal importance is the degree of control and direction exercised by the state over the employee whose negligence is involved." *See, e.g.*, *Lohr v. Larsen*, 431 S.E.2d 642, 644 (Va. 1993). Defendant Kemp does not assert or provide facts establishing the Commonwealth of Virginia's interests or involvement in the functions of his position, and he advances no argument regarding the degree of control and direction exercised by the Commonwealth over him and his county deputies.

District courts in Virginia have devised a multi-factor test to effectuate the purpose of these twin aims. Whether a county sheriff can be considered an arm of the state hinges on the extent of state control over Virginia county sheriffs. Relevant factors include: "[1] whether and to what extent any judgment will be payable from the state treasury; [2] the extent of funding provided to the institution by the state; [3] the extent of the state's control in appointing the governing body of the institution; [4] the degree of the institution's autonomy over its operations; [5] whether the institution is separately incorporated; [6] whether it has the power to sue and be sued and to enter into contracts; [7] whether its property is immune from state taxation; and [8] whether the

---

considered when determining whether he is a state actor; at the time of the *Blankenship* holding, the Virginia state treasury was automatically liable for judgments against state constitutional officers based on a mandatory insurance liability program, yet the court still enumerated seven other factors in the state official inquiry. *See Blankenship*, 918 F. Supp. at 974 (citing VA. CODE ANN. § 2.1–526.8:1 (repealed by Acts 2001)).

institution's function is governmental or proprietary." *Blankenship v. Warren Cnty.*, 918 F. Supp. 970, 974 (W.D. Va. 1996) (citing *McCoy v. Chesapeake Correctional Ctr.*, 788 F. Supp. 890 (E.D. Va. 1992). Using these factors, sheriffs and municipalities can be found jointly liable for certain harms, particularly those in jails, like Mr. Smith has alleged (¶¶ 102, 115–123).

Not only does Defendant Kemp fail to establish that the Commonwealth exercises a degree of control and direction over him sufficient to warrant complete immunity from suit, current state law indicates the opposite: since the *Blankenship* ruling, state laws have decreased oversight of, and extended more autonomy to, sheriffs.[3] For instance, although the Commonwealth used to mandate training and certification of sheriff's deputies, *see* VA. CODE ANN. §§ 2.1–526.8:1 (repealed 2001), the Commonwealth repealed that law, indicating decreased oversight and state interest in county sheriffs' affairs. Notably, the Virginia legislature no longer expressly recognizes county sheriffs as "state officials." *Id.* § 15.1–40.1 (1991) (repealed by Acts 1997). Defendant Kemp relies on outdated law to erroneously claim total immunity from suit; indeed, current law necessitates finding that Defendant Kemp is a local, not state, official, and he is capable of being sued. *See, e.g.*, *Leuenberger*, 2016 WL 355090 at *8. State law demonstrates that the Commonwealth expressly contemplates suits against sheriffs and that the legislature has sought to

---

[3] Many of the Virginia laws previously cited by courts to demonstrate the extent of state control over county sheriffs have been repealed and replaced by comparable laws which grant county sheriffs more autonomy from the Commonwealth. Virginia law "mandate[d] . . . uniform requirements of deputies" but this control has been granted by the State to county sheriffs. *Blankenship*, 918 F. Supp. at 974 (citing VA. CODE ANN. §§ 14.1–73.2; 9–170(35); 15.1–90.3). *Compare* VA. CODE ANN. § 15.1–90.3 (repealed by Acts 1997) (mandating uniform requirements for county sheriffs and their deputies, not limited to the color and style of all shirts, trousers, hats, shoes, leather accessories, ties, blouses, jackets, and coats, as well as all color and typeface requirements for marked vehicles) *with id.* §§ 15.2-1610; 15.2-1611 (1997) (granting county sheriffs with discretion to establish policies for uniforms and marked vehicles, requiring all aspects of design and style of sheriff, deputy, and police officer uniforms be subject to the sheriff's approval and the color and typeface requirements for marked vehicles be under the sheriff's direct control) *See also id.* § 15.2-1613 (1997) (requiring counties and cities, rather than the Commonwealth, to pay for uniforms and personal equipment "required by the sheriff").

curtail the recognition of county sheriffs as "arms of the state," including by abandoning state oversight of sheriffs' deputies.

Defendant Kemp cannot claim total immunity from suit. The Commonwealth has demonstrated a clear legislative intent to restrict automatic entitlement to Eleventh Amendment immunity from county sheriffs. Defendant has failed to show both that he is an arm of the state and that he is entitled to full immunity from suit under the Eleventh Amendment.

## II.  A Four-Year Statute of Limitations Applies to Mr. Smith's ADA Claims.

Mr. Smith's disability discrimination claims were made possible by the Americans with Disabilities Amendments Act of 2008 ("2008 Amendments" or "ADAAA"), and thus the four-year statute of limitations applies. *Latson v. Clarke*, No. 16cv00039, 2017 WL 3098124, at *1 ("If [plaintiff's] claim was made possible by the ADA Amendments Act rather than the pre-amendment ADA, then he can invoke the four-year statute of limitations."). Mr. Smith incorporates by reference his arguments regarding the applicability of the 2008 Amendments from ECF No. 61 at 5–8 and ECF No. 96 at 5–9.

The crux of the disability discrimination allegations against Defendant Kemp is that Mr. Smith was *regarded as* having a substance abuse disorder by CCSO deputies, causing them to berate him for being a "junkie" (¶ 75), ignore his pleas for medical help (¶¶ 77–78), drag and beat him through a courthouse during a medical emergency (¶¶ 78–82), and attempt to influence the magistrate judge to conduct a fundamentally unfair bond hearing on the basis of a mental or physical impairment (¶ 83). These actions deprived Mr. Smith of the benefits of programs and activities in the Carroll County judicial system, and constituted "unequal treatment of [a] disabled person[] in the administration" of public services. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004). Because the 2008 Amendments explicitly expanded, and thereby made possible, a legal claim

where a plaintiff is "regarded as" having a mental impairment, Mr. Smith's legal claim was made possible by the 2008 Amendments. ECF No. 96 at 5–9.

Moreover, the implementing regulations of the 2008 Amendments have now made explicit that addiction is a disability under the ADA. *See* 28 C.F.R. §§ 35.108(a)(1) and (b)(2) (stating that "physical or mental impairment" includes "drug addiction"); *see also* ECF No. 61 at 5–8. Congress "broadened the definition of 'disability' by enacting the ADA Amendments Act of 2008," and its principal purpose is "to make it easier for people with disabilities to obtain protection under the ADA." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (internal citation and quotations omitted). Recognition of Mr. Smith's claim as falling within the broadened definition of "disability" made possible by the 2008 Amendments—including explicit expansion of the right to bring claims for people "regarded as" having a disability, as Mr. Smith claims CCSO did to him (¶¶ 75–83)—not only comports with the requirement to draw all reasonable inferences in favor of the plaintiff, but effectuates Congress's purpose in expanding ADA protections through the 2008 Amendments. *See Jacobs*, 780 F.3d at 572. Mr. Smith has stated a claim under a post-2008 Amendments analysis and the four-year statute of limitations applies to his claim.[4]

---

[4] Even if this Court concludes that the one-year statute of limitations applies, the statute of limitations governing Mr. Smith's ADA claims has been tolled. When applying a state statute of limitations, such as the statute of limitations in the Virginia Disabilities Act, "federal courts are obligated not only to apply the analogous state statute of limitations . . . but also to apply the State's rule for tolling that statute of limitations." *Guerrero v. Weeks*, No. 13CV837, 2013 WL 5234248, at *3 (E.D. Va. Sept. 16, 2013) (internal citations omitted), *aff'd*, 555 Fed. Appx. 264 (4th Cir. 2014). Virginia law provides for tolling of the statute of limitations if the plaintiff is "incapacitated." VA. CODE ANN. § 8.01-229(A)(1). "[C]ourts in this district have relied on the definition of an incapacitated person given in Virginia Code § 64.2–20008 to determine whether a plaintiff is incapacitated for the purpose of tolling the statute of limitations." *Schmitt-Doss v. Am. Regent, Inc.*, No. 12-CV-00040, 2014 WL 3853184, at *5 (W.D. Va. Aug. 5, 2014) (internal quotation marks and alterations omitted), *aff'd*, 599 Fed. App'x 71 (4th Cir. 2015). Mr. Smith meets the definition of "incapacitated" in § 64.2–20008 and is entitled to a full tolling of the applicable statute of limitations. He is "an adult" who, because of Defendants' actions, has been rendered paraplegic and unable to work, and is thus "incapable of receiving and evaluating information effectively." *Id.* He relies on the support of his family and medical staff in order to manage his affairs, and ensure his own health, safety, and well-being. *See id.* His ADA claim has not yet accrued and he is entitled to assert it against Defendants at this time.

III.    **Plaintiff's Factual Allegations Are Sufficient to State a Plausible Claim for Relief Under 42 U.S.C. § 1983.**

Defendant Kemp is liable for the constitutional infringements perpetrated by the Carroll County deputies when executing the "government's policy or custom." *See, e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Defendant has not challenged the unconstitutionality of how Carroll County deputies treated Mr. Smith. Defendant's only issue, it seems, is a disagreement as to whether an underlying policy or custom, attributable to Defendant Kemp, resulted in the deprivation of Mr. Smith's Fourth and Fourteenth Amendment rights. As an initial matter, Defendant Kemp's disagreements and denials regarding the extent to which he delegated authority to his subordinates or the extent of his actual or constructive knowledge of unconstitutional policies are *merits* issues, and do not warrant dismissal at the 12(b)(6) stage. Mr. Smith need not allege any particular "degree of fault (if any)" on behalf of policymakers. *See City of Canton v. Harris*, 489 U.S. 378, 388 n.8 (1989). Defendant Kemp's arguments ultimately fail because Mr. Smith's factual pleadings state a plausible claim for liability—despite Kemp's denials—in two ways.

First, Defendant Kemp is liable for the "deficient programs of police training and supervision [that] . . . resulted in constitutional violations" by officers, specifically the deficient training of procedures and protocols when someone in custody experiences a medical emergency. *See Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987). Second, Defendant Kemp is liable for his "irresponsible failure . . . to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers," including use of excessive force and withholding necessary medical care, "of which [this] specific violation is simply an example." *See id.* Taking all the facts in the First Amended Complaint as true, Mr. Smith has plausibly claimed that Carroll County's deficient

training and Defendant Kemp's deliberate indifference to a custom of unconstitutional behavior resulted in Mr. Smith's lifelong, debilitating injury.

This Court should deny Defendant Kemp's Motion because (A) Defendant Kemp is liable for the county's failure to train deputies in handling emergency medical situations, and (B) Mr. Smith has plausibly alleged that Defendant Kemp tacitly condoned an unconstitutional custom of excessive use of force.

### A.   Defendant Kemp is Liable for the Failure to Train Carroll County Officers in Handling Emergency Medical Situations.

Mr. Smith has plausibly alleged Defendant Kemp's liability for failing to adequately train Carroll County officers by showing three requisite elements: "a specific deficiency in training, rather than general laxness or ineffectiveness," that the training deficiencies resulted from the deliberate indifference towards constitutional rights of persons in Carroll County's custody, and that there is a causal link between the training deficiencies and the harm suffered, such that "the specific violation [was] almost bound to happen, sooner or later." *See Spell*, 824 F.2d at 1390; *see also Harris*, 489 U.S. at 388; *Smith v. Centra Health, Inc.*, No. 20-cv-00016, 2021 WL 1235023, at \*8 (W.D. Va. Mar. 31, 2021). Mr. Smith has stated a plausible claim against Defendant Kemp because (i) he has alleged specific deficiencies in CCSO training, (ii) those deficiencies can be inferred to be the result of deliberate indifference, and (iii) he has alleged a causal link between CCSO's failure to train on medical crisis intervention and his physical trauma and paralysis.

### i.   Mr. Smith Has Alleged Specific Deficiencies in CCSO Training

First, Mr. Smith alleges a "specific deficiency" in the "type of training that should have been required" by the Carroll County Sheriff's Office. *See Spell*, 824 F.2d at 1390; *see also Centra Health*, 2021 WL 1235023, at \*8 (holding that plaintiff stated a plausible failure-to-train claim by

alleging defendant did "not describe or delineate the constitutional limits of the use of force" when training security guards who used tasers).

Mr. Smith has alleged through numerous, specific allegations that CCSO deputies' actions—which ultimately left him paralyzed—were the result of a specific deficiency in training on medical crisis intervention. Mr. Smith has alleged that the deputies involved in paralyzing Mr. Smith were trained by CCSO (¶ 22), that they prioritized arresting Mr. Smith in an Emergency Room for a four-year-old, nonviolent warrant over allowing him to receive emergency medical treatment (¶ 63), that CCSO deputies "tore Mr. Smith out of his hospital bed" and dragged him into a wheelchair to facilitate his arrest (¶ 64), that as a direct result of Carroll County's policies, the deputies failed to take precautions when transporting an individual in custody who is experiencing a medical emergency (¶¶ 70, 73), that they used force on a person in custody who was sedated (¶ 67), and that they either ignored pleas for medical help (¶ 69) or responded with forcible violence to pleas for medical help (¶¶ 77–78). Mr. Smith has specifically alleged that CCSO's lack of policy caused the deputies to fail to take appropriate precautions to avoid causing physical harm or exacerbating injury during detainment (¶ 79). Mr. Smith's allegations go beyond merely stating a vague failure to "train [] officers properly about the rule of law and the Constitutional rights of U.S. citizens" *Centra Health, Inc.*, 2021 WL 1235023 at *8; instead, he has pleaded training deficiencies regarding CCSO deputies' medical crisis intervention practices, directly traceable to Defendant Kemp (¶¶ 17, 147), sufficient to state a claim. *See Centra Health, Inc.*, 2021 WL 1235023 at *8; *see also Sulton v. Baltimore Cnty.*, No. 18-cv-2864, 2021 WL 948820, at *6 (D. Md. Mar. 12, 2021) (finding sufficient plaintiff's allegation that "crisis intervention training" was required for all, as opposed to some, officers).

Allegations like Mr. Smith's are sufficient at the motion to dismiss stage.  For instance, in *Sulton v. Baltimore County*, the plaintiff's family sufficiently alleged that the Baltimore Police Department's failure to train its officers violated the Fourth and Fourteenth Amendments after officers shot the plaintiff during a mental health episode. *See* 2021 WL 948820, at *5–8. There, the U.S. District Court for the District of Maryland found that alleging the Baltimore Police Department had failed to train some but not all of its officers in "crisis intervention" protocols was sufficiently specific to survive a motion to dismiss. *See id.*  Mr. Smith similarly identifies the area of training that is lacking—emergency medical training and medical crisis intervention (¶¶ 70, 73, 77–79).

Defendant's reliance on *Jackson v. Brickey* is inapposite because, in that case, the plaintiff merely alleged a failure to train officers in the "Constitutional rights of U.S. citizens" rather than identify a specific area of training. *See* 771 F. Supp. 2d 593 (W.D. Va. Feb. 11, 2022). Unlike in that case, Mr. Smith identifies a "specific deficiency rather than general laxness," *Spell*, 824 F.2d at 1390, in the Carroll County's Sheriff's Office training with regard to taking "appropriate precautions or actions to ensure that" transportation and handling of "Mr. Smith would not exacerbate his medical condition or cause him physical harm while [] in their custody" (¶¶ 67, 96). Thus, Mr. Smith has "point[ed] out 'a specific deficiency' in [CCSO] training" sufficient to state a plausible claim against Defendant Kemp. *See Sulton*, 2021 WL 948820, at *6 (finding allegation that "crisis intervention training" was required for officers sufficient to state a claim (quoting *Spell*, 824 F.2d at 1390)).

Mr. Smith's allegations describing a specific unconstitutional event are sufficient to state his claim.  The Supreme Court has held that "evidence of a single violation of federal rights," like that alleged by Mr. Smith, "accompanied by a showing that a municipality has failed to train its

employees to handle recurring situations presenting an obvious potential for such a violation, could potentially trigger municipal liability." *Brown*, 520 U.S. at 398 (*citing Harris*, 489 U.S. at 390 n.10).

> **ii.     Mr. Smith's Allegations Are Sufficient to Infer that Defendant Kemp Was Deliberately Indifferent to Unconstitutional Behavior by CCSO Deputies.**

Mr. Smith has plausibly alleged that CCSO's failure to train officers on medical crisis intervention "reflects deliberate indifference to the constitutional rights of its inhabitants" sufficient to state a claim against Defendant Kemp. *See Harris*, 489 U.S. at 390 ("[I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."). Mr. Smith plausibly alleges deliberate indifference because "the need for more or different training [wa]s so obvious" that Kemp could foresee "recurring situations" where persons experiencing medical emergencies in his deputies' custody, like Mr. Smith, would be subjected to excessive force and lack of medical attention. *See Harris*, 489 U.S. at 392; *Brown*, 520 U.S. at 398.

The need to train Defendant's deputies on medical crisis intervention, particularly in the context of deputies performing arrests *at hospitals* (¶¶ 61–64), is plainly obvious. County deputies conducting arrests at hospitals will, inevitably, interact with persons having medical emergencies while in their custody. Making arrests during medical emergencies, or where the person in custody is injured, is a standard part of a police officer's job, and policymakers "know to a moral certainty" that it will occur eventually. *See Harris*, 489 U.S. at 390 n.10.  The need to have protocols and training in place to ensure a person's physical safety while in custody "can be said to be so

obvious[] that failure to do so"—as Mr. Smith has alleged against Defendant Kemp—"could properly be characterized as deliberate indifference to constitutional rights." *See id.*

Moreover, Mr. Smith's situation was not an unforeseeable, isolated incident. Mr. Smith was not the first person to be injured, denied medical care, and forced before a judge while suffering from an injury by the Carroll County Sheriff's Department, giving Defendant Kemp "fair notice that subordinates are engaged in constitutional or statutory deprivations," sufficient to allow an inference of deliberate indifference. *See Brown v. Mitchell*, 308 F. Supp. 2d 682, 703 (E.D. Va. 2004). Recently, another plaintiff sued Carroll County officers for use of excessive force and violations of due process, among other claims, because he alleged the deputies beat him during arrest, refused to take him to receive needed medical care, used force that exacerbated his injuries, and forced him to appear before a magistrate judge while suffering from injury. *Farrar v. Worrell*, No. 19CV00626, 2022 WL 1464710, at *1–2 (W.D. Va. May 9, 2022) (finding genuine issue of material fact regarding excessive use of force where a CCSO deputy "drove [the plaintiff] to the Carroll County Sheriff's Office and took him before a magistrate. . . . Even though [the plaintiff] was 'still bleeding' and 'slumped over,' no one in the Carroll County Sheriff's Office examined his injuries"). The need for emergency medical training and protocols for CCSO deputies to prevent injury and deprivation of constitutional rights—which have been inflicted on Mr. Smith as well as others in CCSO custody—is so obvious that a lack of policies addressing the issue could support a finding of deliberate indifference on Kemp's part.

As such, Mr. Smith has pleaded sufficient factual allegations to state a claim for Defendant Kemp's liability for failure to train CCSO officers. It is obvious that training officers to handle emergency medical situations without exacerbating harm was required to fulfill CCSO deputies' duty to provide medical care and reasonable safety to people in Carroll County's custody, which

they failed to do (¶ 165). Defendant Kemp had notice that officers would consistently be in situations where engaging in the use of excessive force would cause physical harm to individuals experiencing medical emergencies in violation of their Fourth and Fourteenth Amendment rights (¶ 161). Taken as true, these allegations establish Defendant Kemp's failure to train officers for situations like Mr. Smith's demonstrated deliberate indifference to constitutional violations, which led to Mr. Smith's total paralysis.

       iii.     **Mr. Smith Has Plausibly Alleged a Causal Link Between Carroll County's Lack of Medical Crisis Intervention Training and His Injuries.**

Mr. Smith has plausibly alleged a causal link between Carroll County's lack of training for individuals experiencing medical emergencies and his paralysis, trauma, and disability. Where there is an obvious potential for harm, such as here, "a complete failure to train with regard to bedrock police responsibilities such as arrests could render constitutional violations 'bound to happen, sooner or later.'" *See Wynn v. City of Richmond*, No. 21CV530, 2022 WL 2318497, at *13 (E.D. Va. June 28, 2022)) (*citing Moody v. City of Newport News*, 93 F. Supp. 3d 516, 540 (E.D. Va. 2015)). The responsibility to prevent further bodily injury to persons experiencing medical distress, as well as to avoid the use of unconstitutional excessive force, are "bedrock police responsibilities" that, if not addressed properly, would make constitutional violations "bound to happen." *See Wynn*, 2022 WL 2318497, at *13. Mr. Smith alleges that the deputies arrested him at a hospital, physically pulling him out of a hospital bed (¶¶ 63–64); failed to take precautions when transporting him, an individual in custody experiencing a medical emergency (¶¶ 70, 73); used force on him while he was sedated (¶ 67); and that they either ignored pleas for medical help (¶ 69) or responded with forcible violence to pleas for medical help (¶¶ 77–78). He further alleges that the deputies deprived him of fair

access to judicial services on the basis of perceived disability, including physically beating him and dragging him through a courthouse (¶¶ 77–82). He alleges that the deputies shackled him during a medical emergency (¶ 89) and violently threw him in the back of a police van (¶¶ 90–97), unsecured and on his back on the ground (¶¶ 98–100), where he eventually suffered a ruptured spinal abscess (¶ 137).

A failure to train on the "bedrock police responsibilities" of medical crisis intervention, safety measures for placing individuals under arrest, and appropriate processes for handling individuals while in custody makes constitutional violations "bound to happen." *See Wynn*, 2022 WL 2318497, at \*13; *see also Harris*, 489 U.S. at 390 n.10. Taken as true, these allegations are sufficient to establish a link between the unconstitutional conduct—to which Defendant Kemp was deliberately indifferent—and Mr. Smith's permanent injury.

### B.   Defendant Kemp Tacitly Condoned a Custom of Unconstitutional Use of Excessive Force and Deprivation of Due Process Rights.

Even "[w]ithout having been . . . inadequately trained in specific ways by responsible municipal policymakers, police officers, like other public employees, may fall into patterns of unconstitutional conduct in their encounters with suspects, arrestees, persons in custody"—when CCSO deputies fall into such patterns of unconstitutional conduct, as Mr. Smith has alleged (¶¶ 17, 22, 70, 73, 77–79, 83, 89–100, 108, 189, 195), municipal liability attaches where policymakers have actual or constructive knowledge of the custom and fail to correct it. *Spell*, 824 F.2d at 1390. Because "[c]onstructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed," Mr. Smith's allegations allow Defendant Kemp's constructive knowledge to be inferred, and he has stated a plausible claim against Kemp for a custom of unconstitutional use of force within the CCSO. *See id.* at 1391.

Mr. Smith has alleged that Defendant Kemp had "manifest opportunities and [an] official duty" to "be informed," *id.*: Kemp trained and oversaw CCSO deputies (¶¶ 17, 22) who commonly engaged in a custom of unconstitutional conduct, including failing to ensure the safety of those experiencing medical emergencies during custody and transportation as a direct result of CCSO practices (¶ 108); violently throwing individuals into police vans and leaving them unrestrained (¶¶ 94–100); ignoring pleas for medical help and instead responding with excessive force as a direct result of CCSO practices (¶¶ 77–79); improperly influencing legal proceedings in front of magistrates (¶ 83); and forcing incapacitated individuals in front of judges without due process (¶¶ 189, 195). *See Spell*, 824 F.2d at 1391.

In addition, evidence of prior, materially similar conduct by Carroll County officers allows the inference Defendant Kemp plausibly knew that Carroll County officers engaged in a custom of unconstitutional behavior due to the "widespread extent of the practices [and] general knowledge of their existence" and failed to correct it. *See id.* at 1391. In the last four years, two lawsuits similar to Mr. Smith's have been brought against Carroll County officers for excessive use of force. *See Farrar*, 2022 WL 1464710, at *1–2; *Hatcher v. Hauffman*, No. 20-cv-00474, 2021 WL 3084921, at *1 (W.D. Va. July 21, 2021). In both of these cases, plaintiffs alleged excessive force during an arrest and detention by Carroll County deputies and indifference to serious wounds. S*ee Hatcher*, 2021 WL 3084921, at *1; *Farrar*, 2022 WL 1464710, at *6–7. Additionally, in *Farrar*, deputies were alleged to have brought the plaintiff to a magistrate judge in the middle of the night, while injured, and without protecting his due process rights—virtually the same allegations Mr. Smith has raised against the same county sheriff's department. *See* 2022 WL 1464710, at *2. It can be inferred from prior, materially similar conduct by CCSO deputies

that Defendant Kemp knew of and tacitly condoned Carroll County deputies' unconstitutional practices toward individuals with medical needs in their custody.

Defendant confuses Mr. Smith's obligations at the pleading stage with his obligations to prevail at trial or on summary judgment. Defendant Kemp provides no legal support for his assertion that Mr. Smith needs to establish and prove a persistent, well-settled custom in the sheriff's office to state a claim; nor is such a requirement tenable at the pre-discovery pleading stage. *See Owens v. Balt. City St. Atty's Off.*, 767 F.3d 379, 403 (4th Cir. 2014) ("Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."). Mr. Smith is not required to "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Booker v. City of Lynchburg*, No. 20-CV-00011, 2021 WL 519905, at *4 (W.D. Va. Feb. 11, 2021) (quoting *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994)). Indeed, federal courts in Virginia have concluded that plaintiffs with analogous allegations to those of Mr. Smith have adequately pleaded a claim for municipal liability under § 1983. For example, in *Brown*, , the court held that Plaintiff's complaint stated a cognizable failure-to-train claim against the Sheriff for inadequately training guards to recognize and respond to serious medical needs after the death of a *single* person in custody because the case implicated a clear and recurrent constitutional right. *See* 308 F. Supp. 2d at 706.

Mr. Smith's allegations amount to more than conclusory allegations of general "police misconduct" and "excessive force" dismissed in *Lanford v. Prince George's Cnty.* on which Defendant erroneously relies. 199 F. Supp. 2d 297, 305 (D. Md. Apr. 26, 2002). Instead, Mr. Smith has sufficiently stated non-conclusory, specific acts of excessive force and police misconduct sufficient to allege Defendant Kemp tacitly condoned a custom of unconstitutional behavior at the

Carroll County Sheriff's Office of which deputies' behavior toward Mr. Smith is "simply an example." *Spell*, 824 F.2d at 1389; *see also* (¶¶ 17, 22, 77–79, 83, 94–100, 108, 189, 195).

## IV.   Mr. Smith Has Sufficiently Stated a Claim of Intentional Infliction of Emotional Distress (IIED) And Negligent Infliction of Emotional Distress (NIED).

Mr. Smith alleges sufficient facts to plausibly show that CCSO deputies' behavior was (1) "intentional or reckless" in their disregard for the constitutional rights of his constituents, that their indifference led to the (2) "outrageous and intolerable" conduct and (3) that the conduct caused "severe emotional distress." *Russo v. White*, 400 S.E.2d 160, 162–63 (Va. 1991). IIED claims "need not be pled in federal court with the degree of specificity required by Virginia courts." *Nelson v. Green*, No. 06–cv–00070, 2014 WL 131055, at *14 (W.D. Va. Jan. 14, 2014) (internal brackets omitted). Thus, "[f]ederal pleading standards still apply to Plaintiff's IIED claim," and Mr. Smith need only "state a claim that is plausible on its face." *Id.*; *see also Sirleaf v. Doe*, No. 7:21cv00237, 2021 WL 3362033, at *1 (W.D. Va. Aug. 3, 2021).

Defendant does not dispute that he is "liable for the tortious action of [CCSO deputies]" if they were "acting within the scope of [their] employment" at the time the conduct occurred. *Heywood v. Va. Peninsula Reg'l Jail Auth.*, 217 F. Supp. 3d 896, 900 (E.D. Va. 2016) (citing *Plummer v. Ctr. Psychiatrists Ltd.*, 476 S.E.2d 172, 173 (Va. 1996)). In addition to Defendant Kemp being liable for his deputies' conduct under *respondeat superior*, he is liable for his own reckless disregard for, and deliberate indifference to, the constitutional rights of those in Carroll County's custody, allowing his deputies to conduct themselves in an outrageous manner. Defendant also does not challenge that CCSO deputies—whom he employs, oversees, trains, and for whom he is responsible (¶¶ 17, 22–23)— engaged in reckless and intentional disregard for Mr. Smith's health and wellbeing, including life-threatening, intolerable, and outrageous conduct.  Mr.

Smith has stated plausible claims for IIED and NIED because (A) his emotional distress, taken as true, is sufficiently severe, and (B) he suffered a physical injury as a result of his emotional distress.

### A.    Mr. Smith's Emotional Distress is Sufficiently Severe.

Mr. Smith has plausibly alleged that the emotional distress he suffered as a result of the deputies' outrageous behavior was sufficiently severe. In challenging the severity of Mr. Smith's distress, Defendant Kemp has failed to take into account "that more extreme conduct would more plausibly support allegations of severe emotional distress." *Nelson*, 2014 WL 131055, at *16. The severity of the circumstances of this case, including the "trauma of being brought to the brink of death" (¶ 132), underscores the severity of the CCSO deputies' conduct and the resultant emotional distress. Mr. Smith has alleged that Defendant Kemp's deputies exhibited particularly outrageous behavior:

> Deputies called him "a 'junkie,' undermining the imminent and severe status of his medical condition by saying  that he was just "faking it," placing him in custody without any supported or verbalized set of charges, rendering him powerless and unable to defend himself against authority,  leaving  him without any medical attention as Mr. Smith adamantly asserted that he was losing feeling in his legs, and keeping him in the totality of these conditions for a matter of hours while he lay without urgently  needed  medical treatment, any loved ones being notified of his whereabouts . . . (¶ 275).

Mr. Smith faced a life-altering event that has led to debilitating trauma, fear, psychological impacts, and permanent paralysis proximately caused by CCSO deputies (¶¶ 138–140).

Defendant Kemp seeks to rely on several cases that are materially different from Mr. Smith's, each of which is unavailing. In each case, the conduct at issue did not involve physical violence or abuse of police power, and was not found to be "outrageous" at all, let alone rising to the intolerable level in this case. *See* ECF No. 72 at 12; *S.R. v. Inova Healthcare Servs.*, 49 Va. Cir. 119 (Va. Cir. Ct. 1999) (claiming emotional distress after two work colleagues discovered and revealed personal medical information to the rest of his workplace); *Cole v. Oakey*, 101 Va. Cir.

288 (Va. Cir. Ct. 2019) (claiming severe emotional distress as a result of not having access to [plaintiff's] late-husband's ashes, which were given to her step-daughter instead). In contrast to the plaintiffs in those cases, Mr. Smith's emotional distress is the result of violent, state-imposed physical trauma that left him paralyzed and nearly killed him (¶¶ 66, 73–75, 78, 80–81, 89–101).

### B. Mr. Smith Suffered a Fright-Related Physical Injury as a Result of His Emotional Distress.

Mr. Smith has shown that he suffered "symptoms or manifestations of a physical injury" that "was the natural result of fright or shock proximately caused by the [Defendant Kemp's] negligence." *Burnopp v. Carter Bank & Trust*, No. 20CV00052, 2020 WL 6875037, at *3 (W.D. Va. Nov. 23, 2020) (quoting *Myseros v. Sissler*, 387 S.E.2d 463, 464 (Va. 1990). Mr. Smith has alleged an unbroken causal chain between the CCSO deputies' conduct, the resultant emotional distress, and the physical injury stemming from that distress.

Mr. Smith has alleged that Carroll County deputies failed to "take appropriate precautions or action" to prevent further physical harm while he was in custody, despite him "plead[ing] for medical help because he was unable to use his legs" (¶ 106). Prior to the moment Mr. Smith's spinal abscess burst, the deputies pulled Mr. Smith up by his neck and shoulders and made him "repeatedly [fall] to the ground while the deputies verbally harassed him" (¶ 80). Mr. Smith alleges that the abscess on his spine ruptured while "laying unsecured on the metal floor of the van" (¶ 103), where every turn "threw [him] across the floor" (¶ 104), and he was "left [] alone, in the dark, overwhelmed by pain, and terrified for his health and safety" (¶ 101). Mr. Smith has alleged that CCSO deputies "used their position of power as officers of the law to blatantly intimidate Mr. Smith and issue verbal and physical attacks upon him" (¶ 143). As a direct result, Mr. Smith experienced severe emotional distress (¶¶ 139, 144), characterized by insomnia, nightmares (¶

140), and panic attacks.[5] As a result of this emotional distress, Mr. Smith has trouble physically breathing (¶ 141).  Mr. Smith has plausibly alleged that he suffered "physical injury [that] was the natural result of fright or shock proximately caused by [] [D]efendant['s] negligence." *Hughes v. Moore*, 197 S.E.2d 214, 219 (Va. 1973); *see Dao v. Faustin*, 402 F. Supp. 3d 308, 321 (E.D. Va. 2019). His fright-related inability to breathe is sufficient to state an NIED claim under Virginia law. *See Dao*, 402 F. Supp. 3d at 321 (finding "severe knots in [the plaintiff's] back" sufficient physical injury to allege NIED). Mr. Smith's frightening and shocking encounter can be traced to the CCSO deputies' conduct, which resulted in Mr. Smith's emotional distress, including severe anxiety, nightmares, insomnia, and panic attacks (¶¶ 140-141), and most importantly, his fright-related inability to physically breathe (¶ 141).

In addition to Defendant Kemp being liable under *respondeat superior* for his deputies' actions, Kemp's own negligent lack of policy or training to establish protocols for those experiencing medical emergencies led to the fright and shock that Mr. Smith experienced at the hands of CSSO deputies. The lack of protocols allowed the deputies to blatantly "exacerbate [Mr. Smith's] medical condition or cause him physical harm while . . . in their custody" (¶ 108).  The deputies "maliciously used the power dynamic of officer-to-detainee to instill fear, to insult, and to deny cries for help as Mr. Smith suffered a significant spinal injury" (¶ 179), and rendered Mr. Smith helpless to do anything but feel the "trauma of being brought to the brink of death" (¶ 144).

This frightening and shocking encounter not only left Mr. Smith with severe anxiety, nightmares, insomnia, and panic attacks (¶¶ 140-141) but also left him quadriplegic. Every second

---

[5] Mr. Smith's panic attacks and insomnia have occurred continuously since 2020 (¶ 37) and have become a permanent, physical illness. *See* Restatement (Second) of Torts § 436A (1965) ("[L]ong continued nausea or headaches may amount to physical illness, which is bodily harm."). According to the Restatement, "long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character." Restatement (Second) of Torts § 436A (1965). Thus, these symptoms should be sufficient to state a claim for NIED.

the deputies "den[ied] cries for help as Mr. Smith suffered a significant spinal injury" (¶ 179), Mr. Smith was not receiving the medical care he needed to prevent further harm or to reverse his paralysis. The deputies rendered Mr. Smith helpless as he "irreparably and immediately los[t] all sensation in every part of his body, from his chest down" (¶ 111). Thus, Mr. Smith has stated a claim for NIED because Defendant Kemp's negligent lack of training or policy to prevent furthering harm during a medical emergency led to Mr. Smith experiencing "fright or shock" at the hands of Carroll County deputies, which led, in turn, to Mr. Smith's current physical condition.

This type of causal chain showing NIED has been found sufficient to survive a motion to dismiss in Virginia. In *Williams v. Wilson*, the court found that a plaintiff stated a plausible claim for NIED in a factual scenario similar in structure to Mr. Smith's. *See* 101 Va. Cir. 9, 15 (Va. Cir. Ct. Jan. 4, 2018).  The court held that, taking the facts in the complaint as true, the plaintiff had sufficiently alleged that the defendant acted negligently when he did not warn the plaintiff of her husband's violent disposition. *Id.* This negligence put her in her husband's "scope" of violent behavior, which led to the shock and fright of the plaintiff being physically and emotionally abused. *Id.*  The abuse resulted in her physical injuries, and therefore the plaintiff had established a causal chain linking the defendant's negligence to her resultant injuries at the hands of her husband. *Id.* Similarly, Defendant Kemp's negligence put Mr. Smith within the "scope" of CCSO deputies' unconstitutional behavior, which led to ongoing mental and physical injuries (¶¶ 139, 140–41, 144). Thus, here, as in *Williams*, Mr. Smith has sufficiently stated a claim for NIED.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant Kevin A. Kemp's Motion to Dismiss.


Dated: September 28, 2022                          Respectfully submitted,

*s/Aderson Francois*
Aderson Francois (D.C. Bar No. 498544)
(*pro hac vice*)
Lucia Goin (D.C. Bar. No. 1739389)
(*pro hac vice*)
Marissa K. Hatton (D.C. Bar No. 219291)
(*pro hac vice*)
CIVIL RIGHTS CLINIC
GEORGETOWN UNIVERSITY LAW
CENTER
600 New Jersey Avenue NW, Suite 352
Washington, DC 20001
(202) 661-6721
(202) 662-9546
Aderson.Francois@georgetown.edu
Lucia.Goin@georgetown.edu
Marissa.Hatton@georgetown.edu

Samantha Luisa Crisanti
Rebecca X. DiPietro
Ciara Reed
Eleanor Rose Slota
CIVIL RIGHTS CLINIC
GEORGETOWN UNIVERSITY LAW
CENTER
*Student Attorneys*

*/s/ Joshua Erlich*
Joshua Erlich (VSB No. 81298)
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd. #700
Arlington, VA 22201
Tel: (703) 791-9087
Fax: (703) 722-8114
Email:jerlich@erlichlawofice.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2022, I filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will provide copies to all counsel of record who have entered appearances. As all parties have not yet entered appearances, service will be effectuated via mail for those not currently receiving electronic service.

*/s/ Marissa Hatton*

Counsel for Plaintiff