IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOSHUA LEE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:22-cv-00238 |
| | ) | |
| TWIN COUNTY REGIONAL | ) | By: Elizabeth K. Dillon |
| HEALTHCARE, et al., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

The plaintiff, Joshua Lee Smith, suffered a series of injuries that rendered him a quadriplegic.  Smith brings claims against several defendants who he alleges caused his injuries.  (Am. Compl., Dkt. No. 30.)  The defendants have filed motions to dismiss either for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), or for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6).  (*See* Dkt. Nos. 52, 69, 71, 85, 97, 99, 107, 109, 111.)[1]  Some, but not all, of Smith's claims will be dismissed for the reasons stated below.

I.   BACKGROUND[2]

**A.  Factual Allegations**

   **1.  Smith's medical history and substance use disorder**

In 2004, Smith had lower back surgery at Carilion Roanoke Memorial Hospital to treat degenerative disc disease.  After his back surgery, Smith was prescribed opioid pain medication. His pain persisted, and it was discovered that the surgery had caused damage to his sciatic nerve,

---

[1] One of the motions is for judgment on the pleadings.  *See* Fed. R. Civ. P. 12(c).  (Dkt. No. 109.)

[2] The following factual background is taken from the allegations in the amended complaint, which are assumed to be true for purposes of this motion.

resulting in ongoing pain in his back and legs.  Smith was sent to Revival Pain Management, a pain management clinic.

Smith visited Revival Pain Management once each month.  The clinic was responsible for facilitating and monitoring Smith's opioid medication prescription.  In the years following his surgery, Smith visited defendant Twin County Regional Healthcare (also referred to as Twin County Hospital or the hospital) at least five times to treat issues related to the pain in his back and legs.  Smith's ongoing need for pain medication resulted in the development of an addiction to pain medication.  His substance use disorder and surgery complications put him at heightened risk for osteomyelitis, sciatic nerve damage, epidural abscesses, loss of sensation, loss of neurological function, and loss of motor function.  Twin County Regional Healthcare and its providers knew of Smith's medical history.

### 2. Smith's medical emergency

In May of 2020, Smith experienced a medical emergency while visiting his children and family in Virginia.  On the evening of May 2 and early morning of May 3, Smith began to feel a radiating, acute pain in his neck, hands, and shoulders.  The pain was accompanied by a loss of sensation and impaired function in his limbs.  Smith felt his legs getting numb, and when he attempted to stand, he was unable to walk without assistance.

Smith collapsed onto the floor.  While an ambulance was on the way, a 911 operator advised the family not to move Smith from the floor because his inability to walk could indicate a neurological injury.  When the ambulance arrived, Smith could no longer reliably stand or walk, and the first responders entered the home to transport Smith from the bathroom floor to the ambulance.  Smith was secured onto a stretcher and taken to the emergency room at Twin County Regional Healthcare.

### 3. Treatment at Twin County Hospital

Once Smith arrived at the emergency room, he explained to defendants Maribel Rodriguez-Martinez, M.D., and nurses Laura Leonard, Crystal Coleman, Teresa White, and Nurses "A" and "B" (together with Twin County Regional Healthcare, the Medical Defendants) that sensation in his legs was "going in and out," and he was experiencing extreme pain in his neck, back, and legs. Smith was weak, had experienced about 50% loss of sensation in his legs, and struggled to stand without assistance.

Smith was told by the Medical Defendants, however, that they believed he had arrived at the hospital seeking drugs and contrived his symptoms to seek pain medication. Smith was advised that the hospital would not provide him with medical treatment despite his debilitating symptoms. Specifically, Smith was told that the hospital's reason for refusing to treat him was because the Medical Defendants knew of his previous opioid use through the hospital's pain management program in 2008 and 2009.

Smith told the Medical Defendants that he was not seeking pain medication and that he was at the hospital because he was in extreme pain and was rapidly losing function in his legs. Smith's cries for help were ignored, downplayed, and belittled by hospital staff as his pain continued to worsen. The Medical Defendants insisted that Smith did not need medical assistance because he was an addict. Smith explained to the Medical Defendants that he had been experiencing similar symptoms over the last few days, resulting in a fall about three or four days earlier. He reiterated that on that day, the pain he experienced traveled from his neck down to his legs, resulting in a loss of sensation to his lower limbs, difficulty with urination, and a tingling in his hands and arms.

The Medical Defendants ordered a series of routine tests on his blood, a chest x-ray, and

computed tomography (CT) scans.  None of these tests were sufficiently equipped or selected to detect the cause of Smith's debilitating symptoms.  One of the tests, a detection for infection in his urine, came back positive.  Instead of treating Smith's loss of limb function, the Medical Defendants provided him with a shot of Benadryl, an antibiotic, and Ativan, which is a benzodiazepine designed to treat serious anxiety disorders.  The Medical Defendants then printed paperwork with Smith's "after-care instructions."  The instructions stated that Smith had been diagnosed with a urinary-tract infection and that he had also been "seen for paresthesias," which is an "abnormal sensation" often described as "tingling numbness burning, or pricking of the skin."  The report concludes, "We still do not know the cause of your paresthesias.  However it is OK for you to go home."

When the Medical Defendants printed this paperwork, Smith was still unable to stand, feel his lower limbs, or control the lower half of his body.  He was still experiencing debilitating pain and decreased sensation in his hands, shoulders, and neck, and he informed the medical staff that his hands weren't working, he was unable to urinate, and his legs were moving randomly due to electrical impulses.  The Medical Defendants then catheterized Smith to perform a drug test.  They were forced to use a catheter because Smith's lower body was not functioning.

At some point during Smith's visit to the hospital, hospital personnel contacted the Carroll County Sheriff's Office and spoke with defendants Keith Musser and Christopher Mabry, both Carroll County deputy sheriffs.  Deputies Musser and Mabry then became aware of a 2015 charge against Smith for failure to appear for a probation violation for a nonviolent offense. Musser and Mabry came to the hospital to arrest Smith.

Nurses Leonard, Coleman, White, A, and B informed Smith that he was being discharged from the hospital.  Deputies Mabry and Musser, with assistance from the defendant nurses, lifted

4

Smith out of his hospital bed and tried to make him stand.  When Smith was unable to stand, they dragged him into a wheelchair and took him outside.  The Medical Defendants did not confirm whether there was an ongoing risk to Smith's health, did not provide Smith with a way to follow up with the hospital or access emergency care in light of his continuing symptoms, and did not ensure that the deputies transported Smith to a safe facility.  Deputies Musser and Mabry brought Smith—sedated due to the Benadryl and Ativan—into their car using physical force.

### 4. Bond hearing

Deputies Musser and Mabry transported Smith to the Carroll County General District courthouse for a bond hearing at a local magistrate's office in the early hours of May 3, 2020. Smith pleaded for medical attention while he was driven to the magistrate's office, but he was ignored.

Because Smith had limited control over his legs, he could not exit the police car unassisted.  Deputies Musser and Mabry were joined by defendants Deputy Anthony Horton and Deputies "Y" and "Z" (collectively the CCSO Deputy Defendants).  Together, they forcefully pulled Smith from the car.  Unable to support his own weight, Smith fell to the ground.  The five deputies violently pulled Smith up by his neck and under his shoulders, and Smith again fell on the concrete.  The five deputies began to physically drag Smith on a rubber welcome mat while berating him.  They called Smith a "piece of shit junkie" and told him he had just "shot up some bad dope."  Smith pleaded that he needed medical attention.  He emphasized that he could not use his legs.  Instead of providing emergency medical services, the CCSO Deputy Defendants threw Smith onto the rubber mat and dragged him into the courthouse building and down its halls to the office of defendant Jeffrey Wright, the state magistrate who would be overseeing Smith's late-night bond hearing.

5

Attempting to force him to stand, the CCSO Deputy Defendants repeatedly pulled Smith up, gripping his neck and under his shoulders where he was experiencing extreme pain, and dropped him.  Smith fell to the ground over and over again while the deputies verbally harassed him.  The CCSO Deputy Defendants did not attempt to break his fall or catch him to prevent further injury.  Smith was in such great pain that he began to sob.  Even so, the CCSO Deputy Defendants continued to forcibly drag him up and drop him to the ground.  The deputies brought Smith before Magistrate Wright while Smith continued to cry out in pain and plead for medical help.

The deputies communicated with Wright about Smith, frequently referring to his substance use disorder.  Wright told Smith that he had been transported to the courthouse due to his 2015 failure-to-appear charge.  He told Smith that the exchange between them would determine whether Smith would be taken to jail or return home on bond.  Upon seeing that Smith could not stand, Wright told Smith: "If you can stand up and talk to me like a man, you can go home."  Smith was unable to comply with Wright's requirement.  Smith remained on the floor in Wright's office, who told Smith "we know you're faking this" and called him a "junkie."  The exchange at Wright's office lasted about forty-five minutes.

After Smith was denied bond, the CCSO Deputy Defendants shackled Smith's hands— which were entirely numb—to his waist, and then shackled his ankles together.  The five deputies picked Smith up by his chains and his clothing and violently dragged him on the ground, through the office, back to the curb outside, where a police van was waiting.  Smith's mobility was already significantly impaired, and he was losing consciousness.  Now shackled, Smith was unable to walk or otherwise move to the police van.  The deputies continued to mock Smith for being a "junkie" instead of providing medical care.

6

Together, the CCSO Deputy Defendants threw Smith into the back of the police van. The four deputies grabbed Smith's clothing, lifted him off the ground, and swung him back and forth to gain momentum.  Because of his limited mobility, it took the deputies multiple attempts to succeed in throwing Smith into the van.  Smith's hands were shackled to his waist, so he had no means to brace himself or to protect his head and neck from the impact of the throws.  As Smith's body was repeatedly slammed into the bumper, doors, and back of the van, the pain in his legs and back burned.  Each throw introduced new shock waves of pain through his head and neck.  Eventually, the deputies were able to throw him hard enough, and they threw him headfirst into the back of the police van, where he slammed into the floor.  Smith was left lying on his back and unable to sit on the bench in the back of the van.  One of the deputies told Smith that if he was going to "fake" his legs not working, he could just "lay there."  The deputies left Smith unsecured on his back on the floor of the van.

**5.  Transport to New River Valley Regional Jail**

Deputies Horton, Mabry, and Musser drove Smith more than forty minutes away to the New River Valley Regional Jail (NRVRJ) in Dublin, Virginia.  Along the drive to the jail, the van hit various potholes, cracks, and bumps in the pavement, throwing Smith—who was laying unsecured on the metal floor—from one side of the van to the other.  The van was driven erratically, and every sharp corner or turn threw Smith across the floor.  Each van shift and each crack in the pavement sent excruciating waves of pain through Smith's body.  Smith alerted the deputies to his pain, and he continued to plead for medical help because he was unable to use his legs.  Smith asked the deputies several times to avoid hitting bumps.  In response, the deputy who was driving accelerated the van and turned up the music to drown out Smith's pleas.

At some point during the ride, the deputy accelerated over a particularly large bump in

7

the road.  As they drove over the bump, the van jolted, Smith screamed out, and he felt a flash of

pain, as if he had been shocked with a stun gun.  In that moment, Smith immediately and

irreparably lost all sensation in every part of his body, from his chest down.  Smith tried to move

his hands and legs and realized that he was entirely immobile.  He tried to move his fingers and

they were unresponsive.  Smith then lost consciousness.

### 6.  Treatment at NRVRJ

Smith next awoke face down on a concrete floor.  He realized he was in a jail cell, alone.

He was still in the clothes he wore to the hospital.  Smith could not move and could barely

breathe.  He tried to yell for help and could not expand his lungs enough to raise his voice or

speak.  Smith lied there, face down, for several hours.

Eventually, when one of the NRVRJ Officer Defendants[3] brought him breakfast, Smith

tried to communicate that he was paralyzed and in need of help.  One of the NRVRJ Officer

Defendants had to come close to Smith to hear him, as he was barely breathing and unable to

raise his voice above a whisper.  Even though Smith was immobile, face down, and barely

breathing, the NRVRJ Officer Defendants continued to ignore his pleas, left him on the floor of

the cell, and shut the window through which they put his food.

Hours after breakfast was left in Smith's cell, a correctional officer and a nurse making

rounds returned and noticed that Smith was still face down on the same spot on the floor.  At this

point, Smith had been paralyzed and barely breathing for several hours.  The correctional officer

and the nurse called for medical attention from the jailhouse nurse.  The nurse immediately

recognized that Smith was in critical condition, having difficulty breathing, and likely paralyzed.

---

[3] The NRVRJ Officer Defendants include Mary Stewart, Jolen Mabry, Roberta Webb, Derek Trenar, Nikolas McGrady, Justin Archer, Veronica Loop, Derek Tolbert, Brian Cotts, Melissa Edwards, John McNeely, Ashley Umberger, Shaun Benzel, Benjamin Watkins, and NRVRJ Officers "1," "2," and "3."

She expressed shock that Smith had not received medical attention sooner, as he was clearly undergoing a medical emergency.

Smith was rushed to Carilion New River Valley Medical Center, where he was intubated to help him breathe.  As soon as he was stable, he was transported to Carilion Roanoke Memorial Hospital, where he was forced to undergo emergency surgery to try to address infection and salvage the nerves in his spine.

### 7.  Judicial proceedings from hospital bed

Smith awoke at the Roanoke Hospital after emergency surgery.  Smith was shackled to his bed, and he could not communicate because he was intubated and unable to move his hands. Defendant John Doe Officer 4 or 5 was stationed in his room.[4]  During all times where Smith was not on the operating table, Doe Officers 4 and 5 insisted that he be shackled to his hospital bed, despite complaints by the nurses that this impeded his care.

Smith was required to appear for a bond hearing on or around May 10, 2022.  The nurses pleaded with Doe Officers 4 and 5 not to force Smith to appear at a bond hearing from his hospital bed because he was on a ventilator, unable to speak, and heavily sedated.  Nonetheless, the bond hearing was held as Doe Officers 4 or 5 placed an iPad in front of Smith's face as he laid motionless in his hospital bed, intubated and sedated.  The unidentified state magistrate overseeing Smith's bond hearing told Smith to blink or nod his agreement during the hearing. He was released on personal recognizance.  The magistrate told Smith to set a future hearing date when he was able to do so.

Smith remained intubated in Roanoke Hospital for approximately 50 days and remained in his hospital bed recovering for about three to four months.  Smith has not been physically able

---

[4] These defendants are county or state deputies who were responsible for monitoring Smith in his jail cell at NRVRJ and/or in his hospital room at Roanoke Hospital.

to reset a hearing date.  Instead, he has been incapacitated and receiving hospital treatment for his quadriplegia.

### 8. Smith's permanent incapacitation

Smith's immobility was caused by an abscess on his C6 vertebra, which controls lower body functioning such as breathing, walking, and bowel movements.  The abscess on Smith's C6 vertebra ruptured, permanently paralyzing Smith, due to the force placed on his neck and spine while in custody.  Smith now lives in long-term care facilities.  He is permanently paralyzed from his chest down and will never regain the use of his legs.

## B.  Defendants in This Case

The defendants in this matter are:

- The Medical Defendants: Twin County Regional Healthcare, Rodriguez-Martinez, and Nurses Leonard, Coleman, White, Does A, and B;[5]

- Karl Hade, Executive Secretary for the Office of the Executive Secretary of the Virginia Supreme Court;

- Magistrate Wright;

- Kevin Kemp, Sheriff for Carroll County;

- The Carroll County Sheriff's Office (CCSO) Deputy Defendants: Musser, Mabry, Horton, Does Y, and Z;

- The New River Valley Regional Jail Authority (NRVRJA or the Jail Authority), which operates and is responsible for overseeing the NRVRJ;

- The NRVRJ Officer Defendants: Stewart, Mabry, Webb, Trenar, McGrady, Archer, Loop, Tolbert, Cotts, Edwards, McNeely, Umberger, Benzel, Watkins, Does 1, 2, and 3;[6] and

- Doe Officers 4 and 5.

---

[5]  The court may also refer to a subset of these defendants as the Nurse Defendants (Nurses Leonard, Coleman, and White).

[6]  Sheriff Kemp, the CCSO Deputy Defendants, NRVRJA, and the NRVRJ Officer Defendants may also be referred to collectively as the State-Actor Defendants.

### C.  Smith's Claims

Smith alleges the following claims:

- <u>Count One</u>:  Fourth Amendment excessive use of force (CCSO Deputy Defendants and Sheriff Kemp), 42 U.S.C. § 1983;

- <u>Count Two:</u>  Violation of substantive due process (State-Actor Defendants), § 1983;

- <u>Count Three:</u>  Violation of procedural due process (State-Actor Defendants and Doe Officers 4 and 5), § 1983;

- <u>Count Four:</u>  Violation of the Americans with Disabilities Act (ADA) (CCSO Deputy Defendants, Sheriff Kemp, and the Medical Defendants);

- <u>Count Five:</u>  Violation of the ADA (Wright and Hade);

- <u>Count Six:</u>  Violation of the Patient Protection and Affordable Care Act (ACA) (Twin County Regional Healthcare);

- <u>Count Seven:</u>  Medical malpractice (Medical Defendants);

- <u>Count Eight</u>:  Battery (CCSO Deputy Defendants and Sheriff Kemp);

- <u>Count Nine</u>:  Assault (CCSO Deputy Defendants and Sheriff Kemp);

- <u>Count Ten:</u>  Negligence (NRVRJ Officer Defendants and NRVRJA);

- <u>Count Eleven</u>:  Intentional infliction of emotional distress (CCSO Deputy Defendants, Sheriff Kemp, and the Medical Defendants); and

- <u>Count Twelve:</u>  Negligent infliction of emotional distress (CCSO Deputy Defendants, Sheriff Kemp, and the Medical Defendants).

## II.  ANALYSIS

### A.  Controlling Standards of Review

#### 1.  Rule 12(b)(1)—motion to dismiss for lack of subject matter jurisdiction

When a motion is filed pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of the evidence, that subject matter jurisdiction exists. *Demetres v. E.W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).  In considering a facial

challenge to subject matter jurisdiction, the court accepts all of the facts alleged in the complaint as true.  *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018).  A district court should grant a motion to dismiss for lack of subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 645 (4th Cir. 2018).

### 2.  Rule 12(b)(6)—motion to dismiss for failure to state a claim

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017).  Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a Rule 12(b)(6) motion, a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face'") (quoting *Twombly*, 550 U.S. at 570).

### 3.  Rule 12(c)—motion for judgment on the pleadings

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  The court applies the same standard to Rule 12(c) motions and Rule 12(b)(6) motions.  *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).

**B.  Hade and Magistrate Wright (Count Five – ADA)**

Smith asserts a single ADA claim against Hade—the Executive Secretary of the Supreme Court of Virginia—in his official capacity.  Smith asserts that the Office of the Executive Secretary assists with ADA accommodations for public programs and services and has a duty to comply with Title II of the ADA.[7]  Smith also sues Magistrate Wright in his official capacity as a state magistrate.  Smith alleges that Wright discriminated against him based on his disability in conducting his initial bond hearing.  Smith's sole claim against Wright is also an ADA claim. The court will address these motions jointly because Smith seeks to impose liability on Hade, at least in part, for the actions of Wright.

Hade argues that he cannot be held liable for the actions of Magistrate Wright because judges have absolute immunity[8] from claims for money damages arising out of their judicial acts, "even if [their] exercise of authority is flawed by the commission of grave procedural errors" and "even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly."  *Stump v. Sparkman*, 435 U.S. 349, 356, 359 (1978).  Magistrate Wright, in turn, also argues that he is entitled to judicial immunity.  Judicial immunity applies to ADA claims.  *Cannady v. Hogan*, No. JKB-21-0869, 2021 WL 2875509, at *3 (D. Md. July 8, 2021).  State magistrates in Virginia are entitled to judicial immunity, and "[i]ssuing arrest warrants and setting bail are clearly judicial acts, and fall within a state magistrate's subject matter jurisdiction under Virginia law."  *Cadmus v. Williamson*, No. 5:15-CV-045, 2016 WL 1047087, at *8 (W.D. Va. Mar. 10, 2016); *Day v. City of Hampton*, No. 99-1160-AM, 2001 WL

---

[7]  To the extent there are allegations that Hade failed to conduct ADA training and education, those allegations are conclusory and lack specificity regarding any duty, breach of duty, and/or causation.

[8]  "Although somewhat distinct from subject matter jurisdiction, courts have often considered immunity arguments, including arguments of judicial immunity, on Rule 12(b)(1) motions to dismiss."  *Guan v. Bell*, Civil Action No. 1:21-cv-00752, 2021 WL 6048786, at *2 (E.D. Va. Nov. 30, 2021).  The distinction between Rule 12(b)(1) and Rule 12(b)(6) makes no practical difference to the court's analysis.

34803137, at *3 (E.D. Va. June 14, 2001) (finding that a magistrate conducting a bond hearing "is clearly entitled to the cloak of judicial immunity").  Magistrate Wright acted in his judicial capacity and within his subject matter jurisdiction under Virginia law when he presided at Smith's May 3, 2020 bond hearing and denied bail on the failure to appear charge.  Accordingly, both Smith's ADA claim against Magistrate Wright and Smith's ADA claim against Hade, based on Magistrate Wright's conduct, are barred by judicial immunity.

Smith's argument that Hade and Wright are not entitled to judicial immunity because the doctrine only applies in personal-capacity suits, not an official-capacity suit seeking injunctive relief, is not well taken.  Smith's argument imports principles from § 1983 jurisprudence, which are not applicable to Title II ADA claims.  First, ADA claims are not actionable under § 1983. *See Anderson v. Sch. Bd. of Gloucester Cty.*, No. 3:18-cv-745, 2020 WL 2832475, at *21 (E.D. Va. May 29, 2020) ("While the Fourth Circuit has not spoken on the viability of an ADA claim under § 1983, 'every circuit to consider this exact question has held that . . . ADA statutory rights cannot be vindicated through § 1983.'") (citing *Williams v. Pa. Human Relations Comm'n*, 870 F.3d 294, 300 (3d Cir. 2017)).  Second, ADA remedies are not based on the distinction between official and individual capacity claims.  An ADA claim must be brought against the "public entity" itself, 42 U.S.C. § 12132, and liability may be imposed on the public entity for the "statutory violations of its agent."  *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997).  In other words, respondeat superior applies to the Commonwealth as a public entity, not to Wright or Hade or Hade as Wright's alleged supervisor.  The official capacity ADA claims against Hade and Wright are duplicative claims because they are both claims against the Commonwealth of Virginia.

Moreover, even if Smith could circumvent judicial immunity by requesting prospective injunctive relief, he has not made such a request for relief.  His prayer for relief is devoid of any such request.  Rather, Smith points to his allegation that he has an outstanding obligation to set a future hearing date, which he has been unable to do because he has been incapacitated and is now a quadriplegic.  (Am. Compl. ¶¶ 132, 134.)  This is not a request for injunctive relief, and it is not included in any request for relief.  Additionally, there are no allegations that Hade or Wright had anything to do with the hospital room virtual proceeding.

Hade also properly asserts that he is not a proper defendant on Smith's ADA claims alleging that defects in courthouse facilities denied him equal access to those facilities.  Carroll County is responsible for its courthouse facilities.

For these reasons, the court will grant the motions to dismiss filed by Hade and Wright.

## C.  NRVRJA (Count Two – Substantive Due Process; Count Three – Procedural Due Process; Count Ten – Negligence)

Smith alleges federal substantive- and procedural-due-process claims against NRVRJA and a state-law negligence claim.

### 1.  Failure to state a claim (Counts Two and Three)

Because there is no respondeat superior under § 1983, Smith must allege a sufficient basis under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), to hold the Jail Authority liable as an entity.  The Jail Authority argues that Smith has alleged no facts demonstrating that a policy or custom was behind his alleged constitutional deprivations.  Smith alleges that the correctional officers should have known he needed medical attention sooner, but the Jail Authority characterizes this as an isolated incident, not a custom, policy, or practice.  Under *Monell*, a plaintiff can demonstrate an unlawful custom, policy, or practice under one of four theories: (1) through an express policy, such as a written ordinance or regulation; (2) through the

decisions of a person with final policymaking authority; (3) through an omission, such as a failure to train, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

Smith has adequately alleged the existence of a Jail Authority official policy or custom. The amended complaint alleges that the Jail Authority was deliberately indifferent in its failure to train its jail officers.  It notes that, ultimately, the Jail Authority abdicated its responsibility to train officers to respond to the medical needs of its detainees, resulting in a complete denial of necessary medical care to Smith, whose medical needs were completely ignored despite being in the midst of a life-threatening emergency.  Smith further alleges that the severity and obviousness of his symptoms and the sheer number of officers with which he interacted (seventeen) suggests a failure to train.  Further, it is alleged that the need for medical training in any correctional setting is obvious—particularly at NRVRJ, which has frequently experienced medical emergencies with their inmates.[9]

These allegations are sufficient, and the court will deny NRVRJA's motion to dismiss for failure to state a claim.

### 2.  Subject matter jurisdiction (Count Ten)

Regarding the state-law negligence claim, the Jail Authority argues that it is entitled to sovereign immunity, or state sovereign immunity, which is broader than Eleventh Amendment immunity.  *See Heckenlaible v. Va. Reg'l Peninsula Jail Auth.*, No. 06cv25, 2006 WL 3196750,

---

[9]  Smith cites the Jail Authority's public meeting notes recognizing the serious medical needs of individuals incarcerated at NRVRJ.  *See, e.g.*, New River Valley Regional Jail Authority, September 10, 2021 Minutes, at *3, http://nrvrj.org.cdn.pronetsweb.com/wp-content/uploads/2022/01/09_10_21-Minutes.pdf (describing "several inmates" presenting with "serious medical conditions").  The court may take judicial notice of these documents when deciding this Rule 12(b)(6) motion.  *See Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 510 (D. Md. 2013) (taking judicial notice on a Rule 12(b)(6) motion of licensing status on website).

at *2 (E.D. Va. Nov. 1, 2006) (differentiating between Eleventh Amendment immunity and state sovereign immunity).  The Jail Authority is protected by state sovereign immunity if it acts as an "arm or agency of the Commonwealth" or if it is a "municipal corporation performing a governmental function."  *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 876 S.E.2d 917, 923 (Va. 2022).  The parties dispute whether the Jail Authority is a municipal corporation performing a governmental function.

Virginia courts deciding whether an entity is a municipal corporation for purposes of sovereign immunity apply a two-part test developed in *Hampton Roads Sanitation District Commission v. Smith*, 68 S.E.2d 497, 500 (Va. 1952).  First, courts consider how many attributes of a municipal corporation the entity possesses.  *Id.*  Second, in light of this initial consideration, courts consider the particular purpose for which the entity is sought to determine whether it is a municipal corporation.  *Id.*  Under the first part of the analysis, courts consider six attributes:

> (1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth; (2) Creation to serve a public purpose; (3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenue, personal and real property; (4) Possession of the power of eminent domain; (5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state; (6) Management of the corporation vested in a board of directors or a commission.

*City of Richmond v. Richmond Metro. Auth.*, 172 S.E.2d 831, 832 (Va. 1970) (citing *Hampton Rds.*, 68 S.E.2d at 500).  The Supreme Court of Virginia has cautioned that although these six factors are "pertinent to" the inquiry of whether an entity is a municipal corporation, a municipal corporation does not need to possess all six.  *York Cnty. v. Peninsula Airport Comm'n*, 369 S.E.2d 665, 666 (Va. 1988).  "While it is true that the more attributes of a municipal corporation an agency has the more likely it is to be treated as a municipal corporation, the final decision

17

rests on the specific issue of each case." *Hampton Rds.*, 68 S.E.2d at 501. The entity should be recognized as a municipal corporation if "'it appears that the legislature intended that [it] should be so construed.'" *York*, 369 S.E.2d at 666 (quoting *Hampton Rds.*).

Courts have held that regional jail authorities in Virginia are entitled to sovereign immunity pursuant to this analysis. *See Donovan v. Buchanan Cnty. Sheriff's Office*, No. 1:21CV00005, 2022 WL 1580108, at *8 (W.D. Va. May 19, 2022), *Tilson v. Humphrey*, No. 5:19-CV-033, 2019 WL 6902677, at *5–7 (W.D. Va. Dec. 18, 2019); *Haleem v. Quinones*, No. 5:17-cv-00003, 2017 WL 4400767, at *2–7 (W.D. Va. Sept. 30, 2017). *But see Sams v. Armor Corr. Health Servs., Inc.*, No. 19cv639, 2020 WL 5835310, at *14–19 (E.D. Va. Sept. 30, 2020) (finding that a regional jail authority lacks attributes one and four and is not a municipal corporation entitled to sovereign immunity). However, these cases were decided before the Supreme Court of Virginia's 2022 ruling in *Fines*, the first binding authority to clarify the *Hampton Roads* analysis in over three decades. Smith argues that the outcome should now be different under the *Hampton Roads* analysis as clarified by *Fines*.

Prior to *Fines*, all courts conducting the *Hampton Roads* analysis have agreed that regional jail authorities lack attributes one (creation as a body corporate and politic and as a political subdivision) and four (possession of the power of eminent domain) of the six attributes of a municipal corporation, but they have disagreed on whether not lacking these two attributes is sufficient to establish that regional jail authorities do not operate as a municipal corporation. *Compare Tilson*, 2019 WL 6902677, at *5–7, *with Sams*, 2020 WL 5835310, at *14–19. In *Fines*, the Supreme Court of Virginia emphasized the absence of factors one and four in finding that a community services board could not be considered a municipal corporation. 876 S.E.2d at 925–26. The Court also explained, however, that the community services board fully possesses

only attributes two and six, and it "only possesses some of the characteristics of attributes three

and five.  And even regarding those characteristics, it cannot exercise independent authority."

*Id.* at 926.  Thus, the community services board in *Fines* possesses fewer of the characteristics of

a municipal corporation than the Jail Authority.  *Fines* does not stand for the proposition that

lacking attributes one and four of the *Hampton Roads* analysis must result in the entity being

deemed less like a municipal corporation and more like a "'mere auxiliary of a city or county

government.'"  *Fines*, 876 S.E.2d at 925 (quoting *Hampton Rds.*, 68 S.E.2d at 500).  The parties

do not dispute that the Jail Authority fully possesses the four other factors under *Hampton

Roads*.

In the second part of the *Hampton Roads* analysis, the court considers, in light of the first

factor, whether the particular purpose for determining whether the entity is a municipal

corporation involves a matter of substantive or procedural law.  *Fines*, 876 S.E.2d at 926.  If

substantive, the entity is less likely to be declared a municipal corporation.  *Id.  Fines* reached the

"inescapable conclusion" that "immunity from tort liability involves a matter of substantive

law."  876 S.E.2d at 927.  Again, however, the court emphasizes that the community services

board in *Fines* possesses fewer of the characteristics of a municipal corporation than the Jail

Authority under part one of the analysis, and the first part of the analysis then informs the court's

inquiry under part two of *Hampton Roads*.  Thus, the Supreme Court of Virginia's analysis under

part two of *Hampton Roads* in *Fines* does not impact this court's previous analysis and

conclusion that a regional jail authority is a municipal corporation entitled to sovereign immunity

against a substantive tort claim.  *See Haleem*, 2017 WL 4400767, at *5–7.  "The court believes

that, in light of the entire statutory scheme creating jail authorities, a regional jail authority has

the status of a municipal corporation for sovereign immunity purposes, even with these two missing attributes." *Id.* at *5.

Accordingly, the court finds that the Jail Authority is entitled to sovereign immunity with respect to Smith's state-law negligence claim.

***

For the foregoing reasons, the court will grant in part and deny in part the Jail Authority's motion to dismiss.

**D.  Sheriff Kemp in His Official Capacity (Count One – Excessive Force; Count Two – Substantive Due Process; County Three – Procedural Due Process; Count Four – ADA; Count Eight – Battery; Count Nine – Assault; Count Eleven – Intentional Infliction of Emotional Distress; Count Twelve – Negligent Infliction of Emotional Distress)**

Smith seeks to impose liability on Sheriff Kemp for the actions of his deputies in arresting him and transporting him to NRVRJ.  Smith sues Kemp only in his official capacity for excessive force, battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, violations of the ADA, and violations of his substantive due process and procedural due process rights.  Kemp argues that he is entitled to Eleventh Amendment immunity on all claims except the ADA claim, which he asserts is barred by the statute of limitations.

### 1.  Subject matter jurisdiction

Smith brings claims against Sheriff Kemp solely in his official capacity.  "In Virginia, suits against a Sheriff in his official capacity are suits against the state." *Botkin v. Fisher*, Civil Action No. 5:08CV00058, 2009 WL 790144, at *5 (W.D. Va. Mar. 25, 2009).  Also, Smith does not bring claims for injunctive relief. *See Ex Parte Young*, 209 U.S. 123 (1908).  Therefore, Smith's § 1983 and state-law claims against Sheriff Kemp are barred.

Smith argues that whether a county sheriff can be considered an arm of the state hinges on the extent of the Commonwealth's over county sheriffs. *See Blankenship v. Warren Cnty.*, 918 F. Supp. 970, 974 (W.D. Va. 1996) (listing factors). Smith argues that Kemp failed to establish that the Commonwealth exercises a degree of control and direction over him that warrants complete immunity from suit. Smith notes that while the Commonwealth used to mandate training and certification of sheriff deputies, it has since repealed that law. Va. Code § 2.1-526.8:1 (repealed 2001). Even so, courts have consistently and recently found that Virginia sheriffs are considered arms of the state and have Eleventh Amendment immunity with respect to official-capacity claims against them.[10] *Goodwin v. Vanburn*, Civil Action No. 7:22-cv-00164, 2022 WL 2392571, at *1 (W.D. Va. July 1, 2022); *Galvin v. Bath Cnty. Sheriff's Office*, Civil Case No. 7:21-cv-00351, 2021 WL 5149911, at *2 (W.D. Va. Nov. 4, 2021).

For these reasons, the court will grant Sheriff Kemp's motion to dismiss all the claims against him for lack of subject matter jurisdiction, except for the ADA claim.

### 2. Failure to state a claim

Sheriff Kemp, along with other defendants, argues that Smith's ADA claim is barred by the one-year statute of limitations, which is borrowed from Virginia's analogous statute of limitations in the Virginia Disabilities Act. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). The violations alleged by Smith occurred in May 2020, and the initial complaint was filed on May 3, 2022. Thus, if the one-year statute of limitations applies, Smith's ADA claims are barred.

Smith argues that the four-year catch-all statute of limitations for actions arising under federal statutes enacted after December 1, 1990, 28 U.S.C. § 1658(a), applies here. The ADA

---

[10] The court also notes that state employees acting in their official capacities are not "persons" for purposes of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

was enacted before that date, but amended on September 25, 2008, to revise the definition of

disability.  However, if an ADA claim was cognizable prior to the ADA Amendments Act, the

one-year limitations period applies.  *See Latson v. Clarke*, 346 F. Supp. 3d 831, 858 (W.D. Va.

2018).  Smith alleges disability based on his substance use disorder, which disorder was

recognized as a disability under the 1990 version of the ADA.  *A Helping Hand, LLC v. Balt.*

*Cnty.*, 515 F.3d 356, 367 (4th Cir. 2008) (finding that drug addiction constitutes an impairment

under the ADA).

To overcome this hurdle, Smith maintains that his claim arises under the 2008 ADAAA

because it was made possible by the 2008 enactment.  He asserts that, prior to the 2008 ADAAA,

addiction and substance abuse were often not considered disabilities because they were viewed

as temporary in nature.  The ADAAA made clear that impairments that are episodic or in

remission, like substance use disorders, can still qualify as disabilities under the ADA if they

would "substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D).  Also,

the ADAAA stated that the determination of whether an impairment substantially limits a major

life activity must be made without regard to whether the individual relies on "mitigating

measures," such as "medication" or "learned behavioral . . . "modifications."  *Id.* §

12102(4)(E)(i)(I), (IV).  Further, the ADAAA broadened the interpretation of "substantially

limits" and "major life activity" in favor of "broad coverage of individuals."  *Id.* § 12102(4)(A).

Because the court must look only to the allegations in the amended complaint on a

motion to dismiss, because it is plausible that the ADAAA could have expanded Smith's rights,

and because further factual development is necessary for the court to determine the appropriate

statute of limitations, the motion to dismiss of Kemp, and the other defendants asserting this

same argument, will be denied.

**E.  CCSO Deputy Defendants (Count One – Excessive Force; Count Two – Substantive Due Process; Count Three – Procedural Due Process; Count Four – ADA; Count Eight – Battery; Count Nine – Assault; Count Eleven – Intentional Infliction of Emotional Distress; Count Twelve – Negligent Infliction of Emotional Distress)**

The CCSO Deputy Defendants move to dismiss all claims against them except the substantive-due-process (Count Two), battery (Count 8) and assault (Count 9) claims.  They move to dismiss under Rule 12(b)(6) only.

**1.  Excessive-force claim (Count One)**

Defendants argue that the excessive-force claim is governed by the Fourteenth Amendment rather than the Fourth Amendment because Smith was a pretrial detainee.  In response, Smith argues that he has adequately pleaded excessive-force claims arising from defendants' treatment of him prior to the bond hearing; the Fourth Amendment governs all of his excessive-force claims, not just those arising "during and after" the bond hearing; and to the extent the Fourteenth Amendment applies to any of his excessive-force claims, Smith has sufficiently pled those claims under the Fourth and Fourteenth Amendments.

Regarding the distinction between the Fourth and Fourteenth Amendments, Smith argues that he cannot be considered a pretrial detainee because his interactions with the deputies occurred either prior to or during his arrest, not following any arrest effectuated by the deputies, and he did not receive the critical judicial determination of probable cause necessary to change his status to a pretrial detainee.  *Riley v. Dorton*, 115 F.3d 1159, 1166 (4th Cir. 1997).  As to the probable cause determination, this requires a determination by a "neutral and detached magistrate," *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975), and Smith's allegations, which must be taken as true, are that the magistrate was not neutral or detached, and did not make a probable cause determination.  The magistrate conditioned his determination on whether Smith could stand, which is irrelevant to the probable cause analysis.

23

The court agrees with Smith that, given his allegations, the amendment governing his claim is the Fourth Amendment, but, ultimately, the distinction does not matter.  Smith has adequately alleged a claim under either amendment, which the CCSO Deputy Defendants do not contest.  *See Anderson v. Rodriguez*, 1:14cv149 (CMH/MSN), 2016 WL 8732311, at *4 (E.D. Va. June 3, 2016) (explaining that on an excessive-force claim, courts consider the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, and whether the force was applied in good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm) (citing *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008)).  Therefore, this claim is not subject to dismissal.

## 2.  Procedural-due-process claim (Count Three)

To establish a violation of procedural due process, a plaintiff must establish: (1) a constitutionally cognizable life, liberty, or property interest; (2) a deprivation of that interest caused by some form of state action; and (3) that the procedures employed were constitutionally inadequate.  *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).  "At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard."  *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 146 (4th Cir. 2014) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  To determine what constitutes a meaningful opportunity to be heard, courts engage in the three-part balancing inquiry outlined in *Mathews v. Eldridge* by considering:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's

24

> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirements would entail.

424 U.S. at 335; *see also Snider Int'l Corp.*, 739 F.3d at 146.

Smith argues that he has cognizable liberty interests implicated by the deputies' conduct; defendants erroneously deprived him of these interests by subjecting him to unjustified physical harm and a deficient bond hearing; the value of additional safeguards is high; and there is no governmental interest in depriving him of adequate procedures. *See Elhady v. Kable*, 993 F.3d 208, 228 (4th Cir. 2021). For instance, defendants used unjustified force because he was not resisting arrest and deprived him of his liberty by forcing him to attend a bond hearing while incapacitated.

Smith's procedural-due-process claim is just a repackaged version of his substantive-due-process claim, which defendants do not move to dismiss. *See Snider Int'l Corp.*, 739 F.3d at 145–46 (describing the distinction between substantive and procedural due process). For instance, officers do not give notice when they are about to use excessive and unjustified force. "Procedural due process prevents mistaken or unjust deprivation, while substantive due process prohibits certain actions regardless of procedural fairness." *Id.* at 145 (citing *Zinermon v. Burch*, 494 U.S. 113, 125–26 (1990); *Carey v. Piphus*, 435 U.S. 247, 259 (1978)).

Because it is more appropriately a substantive due process claim, the court will dismiss Smith's procedural-due-process claims against the CCSO Deputy Defendants.

### 3.  ADA claim (Count Four)

As other defendants have argued, the CCSO Deputy Defendants argue that Smith's ADA claim is time-barred. For the reasons previously stated on pages 21–22 herein, the ADA claim will not be dismissed.

####     4.  **Intentional- and negligent-infliction-of-emotional-distress claims (Counts Eleven and Twelve)**

To state a claim for intentional infliction of emotional distress, Smith must allege facts showing that the CCSO Deputy Defendants' conduct was (1) intentional or reckless, (2) outrageous and intolerable, (3) that it caused him emotional distress, and (4) that the emotional distress is severe. *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). When the conduct is merely negligent, a plaintiff must allege physical injury resulting from the emotional distress. *Thompson v. Town of Front Royal*, 117 F. Supp. 2d 522, 532 (W.D. Va. 2000). "The requisite physical injury for a claim of negligent infliction of emotional distress must be the 'natural result of fright or shock proximately caused by the defendant's negligence.'" *Id.* (quoting *Delk v. Columbia/HCA Healthcare Corp.*, 523 S.E.2d 826, 834 (Va. 2000)). In other words, "there may be a recovery in such a case if, but only if, there is shown a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury." *Delk*, 523 S.E.2d at 834.

Smith has alleged sufficient facts to show that his emotional distress is severe. The deputies allegedly called Smith a "junkie" and accused him of faking his symptoms; they shackled him and threw him into the back of a police van, leaving him to lay there unsecured; and they transported him to NRVRJ in a violent and erratic manner that caused his paralysis. They did all of this while Smith pleaded with them for help and cried out in pain. Smith experienced the "trauma of being brought to the brink of death." (Am. Compl. ¶ 144.) These allegations plausibly support allegations of severe emotional distress. *See Nelson v. Green*, No. 06-cv-00070, 2014 WL 131055, at *16 (W.D. Va. Jan. 14, 2014) (explaining that "more extreme conduct would more plausibly support allegations of severe emotional distress"). The allegations further support a causal connection between the defendants' negligence, Smith's

emotional injury, and a physical injury.  Smith has alleged severe emotional distress, caused by defendants' physical and verbal abuse, characterized by insomnia, nightmares, and panic attacks, resulting in him being physically unable to breath.  (*See* Am. Compl. ¶¶ 139–44.)

Smith has stated claims for intentional and negligent infliction of emotional distress against the CCSO Deputy Defendants.

### 5. Eleventh Amendment immunity

Like Sheriff Kemp, the CCSO Deputy Defendants are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacities.  *See Goodwin*, 2022 WL 2392571, at *1; *Galvin*, 2021 WL 5149911, at *2.  An official-capacity claim against a sheriff deputy is the same as an action against the entity for which the deputy is an agent.  *See Gemaehlich v. Johnson*, Civil Action No. 7:12cv00263, 2013 WL 589234, at *4 (W.D. Va. Feb. 14, 2013).  Unlike Sheriff Kemp, these defendants are also sued in their individual capacities, but to the extent they are sued in their official capacities, they are entitled to immunity on any damages claims.[11]

\*\*\*

For the foregoing reasons, the CCSO Deputy Defendants' motion to dismiss will be granted as to Smith's procedural-due-process claim and Smith's official-capacity claims, aside from the ADA claim.  The motion is denied in all other respects.

---

[11]  This reasoning does not apply to Smith's ADA claims.  An official capacity ADA claim for damages is a claim against the entity of which the individual is an agent, and Congress has abrogated sovereign immunity for such claims.  *See Fauconier v. Clarke*, 966 F.3d 265, 280 (4th Cir. 2020) (noting that Title II of the ADA "validly abrogates state sovereign immunity," and an ADA claim "for damages against the defendants in their official capacity" is "effectively" a claim "against the State").  These claims appear to be duplicative to the official-capacity ADA claim against Sheriff Kemp.

**F. NRVRJ Officer Defendants (Count Two – Substantive Due Process; Count Three – Procedural Due Process; Count Ten – Negligence)**

The NRVRJ Officer Defendants move to dismiss all claims against them for failure to state a claim—Counts Two (substantive due process), Three (procedural due process), and Ten (negligence).

**1. Personal involvement (Counts Two and Three)**

To assert liability under § 1983, Smith must affirmatively demonstrate that each defendant acted personally to deprive him of his constitutional rights. *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). Here, the names of the NRVRJ Officers appear only once, in the caption of the case, and Smith did not name a single officer who took any action against him to deprive him of his constitutional rights. For example, he vaguely alleges that "one of the NRVRJ officers" brought him breakfast, and when he tried to communicate with the officer, the officer "had to come close to Mr. Smith to hear him, as he was barely breathing and unable to raise his voice above a whisper." (Am. Compl. ¶¶ 118, 119.) Moreover, he alleges that "Defendant NRVRJ Officers ignored his pleas, left him on the floor of the cell, and shut the window through which they put his food." (*Id.* ¶ 120.) NRVRJ Officer Defendants assert that these allegations are insufficient to allege their personal involvement in any deprivation of constitutional rights.

Generally, defendants are correct in that the court usually requires more specific pleading than is found in Smith's amended complaint. Indeed, the Fourth Circuit recently confirmed this general principle. *Langford v. Joyner*, --- F. 4th ----, 2023 WL 2335957, at *2 (4th Cir. Mar. 2, 2023) ("only collective allegations against all 'Defendants,' without identifying how each individual Defendant personally interacted with Langford or was responsible for the denial of his Eighth Amendment rights" found to be insufficient to state a claim.). Langford's health,

28

however, did not cause him to be disadvantaged in his ability to identify person.  Furthermore, the court in *Langford* noted, "[w]e do not categorically foreclose the possibility that a complaint that makes allegations collectively against 'Defendants' may sometimes survive a motion to dismiss.  After all, determining whether a complaint states a plausible claim for relief is a 'context-specific task.'"  *Id.* at *4 (quoting *Iqbal*, 556 U.S. at 679).

Here, unlike Langford, Smith was incapacitated.  He alleges he was paralyzed and had passed-out on the floor of a concrete jail cell.  He was clearly "disadvantaged . . . in identifying precisely which officers committed which bad acts."  *J.A. v. Miranda*, No. 16-3953, 2017 WL 3840026, at *3 (D. Md. Sept. 1, 2017).  Despite this disadvantage, Smith has identified a subgroup of defendants, jail officers, that interacted with him, and identified specific actions, with particularity, taken by those defendants.  *See, e.g.*, Am. Compl. ¶ 119 (jail officer stepped close to hear whispered pleas for help), ¶ 120 (officers "ignored his pleas, left him on the floor of the cell, and shut the window through which they put his food").  These allegations are sufficient to give these defendants fair notice of the claims against them.  Therefore, the court will deny the NRVRJ Officer Defendants' motion to dismiss Counts Two and Three.

### 2.  Sovereign immunity (Count Ten)

The NRVRJ Officer Defendants argue that the Jail Authority's state sovereign immunity should extend to them.  To determine whether the Jail Authority's immunity extends to its employees, courts analyze the following factors: (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in the function; (3) the degree of control exercised by the state over the employee; and (4) whether the act complained of involved the use of judgment and discretion.  *Messina v. Burden*, 321 S.E.2d 657, 663 (Va. 1984).

29

The nature of the function performed by the jail officers was the "medical treatment of individual inmates . . . on a day-to-day basis," not the general governmental function of the "safe and competent administration of [the Commonwealth's] local correctional facilities." *Jennings v. Hart*, 602 F. Supp. 2d 754, 759 (W.D. Va. 2009).  As the court explained in *Jennings*, "although the state has a general interest in the proper medical care of patients treated at its hospitals, its interest and involvement in the treatment of a specific patient . . . at a state-owned hospital is slight." *Id.* (citing *James v. Jane*, 282 S.E.2d 864, 870 (Va. 1980)).  In other words, the Commonwealth has minimal interest and control "over the medical treatment of particular inmates" like Smith. *Id.*  Further, the acts or omissions giving rise to Smith's negligence claims involved ministerial acts.  (*See, e.g.*, Am. Compl. ¶ 121 (alleging that defendants "failed to adequately ensure that Mr. Smith did not require immediate medical assistance, did not take steps to mitigate his existing medical condition, and did not provide or facilitate the immediate care or assistance that Mr. Smith required").)  This case is much like *Jennings*, where the court determined that jail officers' actions were ministerial where they ignored a detained person's repeated requests for medical attention and worsening symptoms due to severe headaches and dizziness.  602 F. Supp. 2d at 757–59.

The NRVRJ Officer Defendants are not entitled to immunity for the additional reason that Smith has adequately alleged facts to support a claim for gross negligence. *See Thornhill v. Aylor*, No. 15-cv-00024, 2016 WL 8737358, at *13 (W.D. Va. Feb. 19, 2016) ("It is well-established that state officials are not entitled to sovereign immunity when they are accused of an intentional tort or acts constituting gross negligence.").  Gross negligence is "that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another." *Dowdy v. Pamunkey Reg'l Jail Auth.*, No. 3:14-cv-003, 2014 WL 2002227,

at *5 (E.D. Va. May 15, 2014).  Smith alleges that he was entirely unconscious when he was

taken to the jail, and the jail officers ignored his obvious signs of medical distress, leaving him

alone for hours, lying on the floor of the jail cell.  *See Caramillo v. Correct Care Sols.*, No.

2:19cv362, 2020 WL 4747786, at *8 (E.D. Va. Feb. 28, 2020) (finding that plaintiff had

sufficiently alleged a gross negligence claim where jail officials "knew of . . . systemic problems

. . . that put inmates . . . at risk of injury or death, and failed to take steps to remedy the

problems").

    For these reasons, the court will deny the NRVRJ Officer Defendants' motion to dismiss

in its entirety.

### G. Nurse Defendants (Count Four – ADA; Count Seven – Medical Malpractice; Count Eleven - Intentional Infliction of Emotional Distress; Count Twelve – Negligent Infliction of Emotional Distress)

    The Nurse Defendants move to dismiss all four claims against them for failure to state a

claim—Counts Four (ADA), Seven (medical malpractice), Eleven (intentional infliction of

emotional distress), and Twelve (negligent infliction of emotional distress).

#### 1. Rule 8

    The Nurse Defendants argue that all the claims against them should be dismissed because

Smith does not make any specific allegations against any Nurse Defendant.  Instead, Smith

brings allegations against them collectively, grouped together with Dr. Rodriguez-Martinez.

Such allegations, they argue, are akin to "kitchen-sink" or "shotgun" complaints that are

"pernicious because they unfairly burden defendants and courts by shifting onto them the burden

of identifying plaintiff's genuine claims and determining which of those claims might have legal

support."  *Suttman-Villars v. Argon Med. Devices, Inc.*, 553 F. Supp. 3d 946, 954 (D.N.M.

2021).

31

The court does not agree.  The amended complaint names three identifiable nurses who took specific actions regarding Smith, described in detail, on the night of May 3, 2020, including refusal to render assistance due to perceived disability.  For example, Smith alleges that, upon arriving at the ER, "he explained to Defendant Rodriguez-Martinez and Nurse Leonard, Coleman, White, A, and B . . . that sensation in his legs was going 'in and out' and he was experiencing pain in his neck, back, and legs."  (Am. Compl. ¶ 44.)  In response, the Nurse Defendants told Smith that "they believed he had arrived at the hospital seeking drugs and contrived his symptoms just to seek pain medication, and that there was nothing wrong with him," and that they "would refuse to provide him with medical treatment," specifically because they "knew of his previous opioid use."  (*Id.* 46–48.)  Smith also alleges actions by the Nurse Defendants that are separate from the doctor—they contacted and coordinated with the Carroll County Sheriff's Office to facilitate his arrest.  (*Id.* 60–61.)  Thus, the complaint gives fair notice of the grounds that support Smith's claims.[12]

### 2.  Medical malpractice claim (Count Seven)

A medical malpractice claim brought under Virginia law must allege the defendant owed plaintiff a duty, breached the duty, and proximately caused plaintiff's damages.  *Raines v. Lutz*, 341 S.E.2d 194, 196 (Va. 1986).  The Nurse Defendants argue that they do not have the education, training, or licensing to perform any of the tasks Smith alleges they failed to perform; thus, Smith cannot plausibly allege that they breached any duty to perform those tasks.  The

---

[12]  The court finds that the allegations against the Nurse Defendants are distinguishable from those found insufficient in *Langford* for the same reasons discussed above with respect to the NRVRJ Officer Defendants. While Smith was not paralyzed and incapacitated at the time he interacted with the Nurse Defendants, he still was in severe pain and was there for a very short time.  Thus, he was at a disadvantage in identifying which defendant was committing which particular act.

Nurse Defendants do not dispute that Smith's complaint plausibly alleges the remaining elements of a medical malpractice claim.

Nurses are not covered by a blanket standard of care; the standard depends on the facts of any given case.  Va. Code § 8.01-581.20; *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 692 (4th Cir. 2011) (holding that an expert was qualified "to testify regarding the standard of care for obstetrical nurses" and that, rather than a general nursing standard of care, "the standard of care at issue concerns the postpartum monitoring of a high-risk patient with preeclampsia").  To the extent the Nurse Defendants dispute the standard of care, this is a factual issue needing resolution through expert testimony.  *Washington v. Brooks*, No. 3:20cv88-HEH, 2022 WL 89171, at *11 (E.D. Va. Jan. 7, 2022) (explaining that the elements of a medical malpractice claim, including duty and breach, "are normally proven through expert testimony").  The specific contours of the Nurse Defendants' duties are fact-specific and should be proven through expert testimony, and Smith plausibly alleges that the Nurse Defendants breached their duty when they refused to treat him and remanded him to custody in the middle of a life-threatening medical emergency.

### 3.  Intentional- and negligent-infliction-of-emotional-distress claims (Counts Eleven and Twelve)

Regarding the claim for intentional infliction of emotional distress, Smith has plausibly alleged that the Nurse Defendants' conduct was outrageous and intolerable and that his emotional distress was severe.  This includes the Nurse Defendants' verbal harassment of Smith and their withholding of adequate medical care.  Smith has also sufficiently pleaded his claim for negligent infliction of emotional distress because he plausibly alleged that his physical inability to breathe is the "natural result of fright or shock proximately caused by [defendants']

negligence." *Burnopp v. Carter Bank & Trust,* No. 20CV00052, 2020 WL 6875037, at *3 (W.D. Va. Nov. 23, 2020).

### 4. ADA claim (Count Four)

As other defendants have argued, the Nurse Defendants argue that Smith's ADA claim is time-barred.  For the reasons previously stated on pages 21–22 herein, the ADA claim will not be dismissed.

On the merits, to state a claim for public services accommodation under Title III of the ADA, a plaintiff must allege facts showing that: (1) he is disabled within the meaning of the ADA; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against him because of his disability.  *J.D. by Doherty v. Colonial Williamsburg Found*, 925 F.3d 663, 669–70 (4th Cir. 2019).  Under the first prong, the ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).

Defendants argue that Smith's substance use disorder does not qualify as a disability under the first prong of the definition—a physical or mental impairment that substantially limits one or more major life activities.  Defendants cite a case explaining that an ADA claimant must demonstrate that "drug addiction was 'substantially limit[ing]' one or more 'major life activities' or that drug addiction actually substantially limited one or more 'major life activities' because of the attitudes of others towards the addiction."  *A Helping Hand*, 515 F.3d at 367.  However, the ADA was amended since that case was decided with the enactment of the ADAAA in 2008. Those amendments may allow Smith to establish disability under the actual disability prong by showing that the impairment "substantially limits [his] ability . . . to perform a major life activity

34

as compared to most people in the general population."  28 C.F.R. § 36.105(d)(1)(v); *see also*

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 573 (4th Cir. 2015) ("An impairment

need not prevent, or significantly or severely restrict, the individual from performing a major life

activity in order to be considered substantially limiting.").  Smith alleges that his substance use

disorder impacts major life activities such as thinking, communicating, eating, walking,

breathing, and working.  (Am. Compl. ¶ 201); *see* 42 U.S.C. § 12102(2)(A) (listing major life

activities).  Thus, Smith has plausibly alleged an actual disability that substantially limits him in

performing various major life activities in comparison to most other people.

Smith also plausibly alleges disability under the other two prongs—record of such an

impairment or being regarded as having such an impairment.  The Nurse Defendants had access

to Smith's medical history, including his substance use disorder.  (Am. Compl. ¶¶ 35–36.)  He

visited the hospital several times for pain treatment.  (*See* Am. Compl. ¶¶ 28–34.)  And Smith

has alleged that the Nurse Defendants refused to treat him because he was an addict and they

thought he was engaging in drug-seeking behavior.  (*Id.* ¶¶  46–47, 51.)

Finally, the Nurse Defendants argue that they cannot be liable under Title III because

they do not own, lease, or operate a place of public accommodation.   The Nurse Defendants may

be plausibly liable as operators of the hospital because they had authority to provide medical

services to patients in the emergency room, and they were exercising their discretion to

discriminate against Smith.  *Clement v. Satterfield*, 927 F. Supp. 2d 297, 313–15 (W.D. Va.

2013) (explaining that individuals can be defendants under Title III and finding that person "in a

position of authority" was a proper defendant); *see also Howe v. Hull*, 873 F. Supp. 72, 74–78

(N.D. Ohio 1994) (finding that an on-call physician who refused to admit a patient was amenable

to suit under Title III).  While the proof may not ultimately confirm this, the allegations are sufficient.

For these reasons, the Nurse Defendants' motion to dismiss will be denied.

**H.  Twin County Regional Healthcare (Count Four – ADA; Count Six – Patient Protection and Affordable Care Act; Count Seven – Medical Malpractice; Count Eleven – Intentional Infliction of Emotional Distress; Count Twelve – Negligent Infliction of Emotional Distress)**

Twin County Regional Healthcare moves for judgment on the pleadings on the five claims brought against it: violation of the ADA (Count Four), violation of the Patient Protection and Affordable Care Act (Count Six), medical malpractice (Count Seven), and intentional and negligent infliction of emotional distress (Counts Eleven and Twelve).

**1.  ADA claim (Count Four)**

As other defendants have argued, Twin County Regional Healthcare argues that Smith's ADA claim is time-barred.  For the reasons previously stated on pages 21–22 herein, the ADA claim will not be dismissed.

The hospital also argues that Smith's has not stated a plausible Title III ADA claim.  This argument is also rejected for the reasons previously stated regarding the Nurse Defendants.

**2.  ACA claim (Count Six)**

The ACA prohibits disability discrimination by incorporating the Rehabilitation Act. *Kadel v. N.C. State Health Plan for Teachers & State Employees*, 12 F.4th 422, 436 (4th Cir. 2021).  The definition of disability is the same under the ADA and the Rehabilitation Act. *Williams v. Kincaid*, 45 F.4th 759, 765 n.1 (4th Cir. 2022).  Therefore, Smith has stated a claim under ACA for the same reasons he has stated an ADA claim.

The hospital also argues that Smith's ACA claim is time-barred.  Similar to the argument that the ADA claims are time-barred, the hospital argues that Virginia's one-year statute of

36

limitations applies because the ACA does not include a statutorily-mandated limitations period.
However, because the ACA was enacted after 1990, the four-year catch-all statute of limitations
applies.  28 U.S.C. § 1658(a); *see Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66 (2d Cir. 2021)
(applying four-year limitations period to ACA disability claim because claim was "made
possible by" ACA's enactment).  Thus, the claim is not time-barred.

### 3.  Medical malpractice claim (Count Seven)

The hospital argues that it cannot be liable for medical malpractice because the Nurse
Defendants cannot be liable for medical malpractice.  As the court has explained, Smith
plausibly alleges medical malpractice claims against the Nurse Defendants.  Therefore, the court
will deny the motion to dismiss this claim.

### 4.  Intentional- and negligent-infliction-of-emotional-distress claims (Counts Eleven and Twelve)

The hospital also moves to dismiss these claims on the same grounds stated by the Nurse
Defendants.  As the court has explained, Smith plausibly alleges claims for intentional and
negligent infliction of emotional distress against the Nurse Defendants.  Therefore, the court will
deny the motion to dismiss these claims.

Accordingly, Twin County Regional Healthcare's motion to dismiss will be denied in its
entirety.

## I.  Dr. Rodriguez-Martinez (Count Four – ADA; Count Seven – Medical Malpractice; Count Eleven – Intentional Infliction of Emotional Distress; Count Twelve – Negligent Infliction of Emotional Distress)

Smith brings claims against Dr. Rodriguez-Martinez for violation of the ADA, medical
malpractice, and intentional and negligent infliction of emotional distress.  Dr. Rodriguez-
Martinez moves to dismiss these claims pursuant to Rule 12(b)(6).

### 1.  ADA claim (Count Four)

As other defendants have argued, Dr. Rodriguez-Martinez argues that Smith's ADA
claim is time-barred.  For the reasons previously stated on pages 21–22 herein, the ADA claim
will not be dismissed.

Dr. Rodriguez-Martinez also argues that she cannot be liable under Title III because she
does not own, lease, or operate a place of public accommodation.   Similar to the Nurse
Defendants, Dr. Rodriguez-Martinez is plausibly liable as an operator of the hospital because she
had authority to provide medical services to patients in the emergency room, and she was
exercising her discretion to discriminate against Smith.  *See Clement*, 927 F. Supp. 2d at 313–15
(citing *Howe*, 873 F. Supp. at 77).

Finally, Dr. Rodriguez-Martinez argues that Smith's request for declaratory relief is moot
because he is no longer a patient at the hospital.[13]  Smith's ADA claim is not moot because a
"case may remain live even if the events giving rise to the lawsuit cease." *Feldman v. Pro
Football, Inc.*, 419 F. App'x 381, 387 (4th Cir. 2011).  Smith has a history of visiting Twin
County Regional Healthcare, has family residing in Virginia, and suffers from permanent
incapacitation requiring constant medical attention.  Therefore, it is not "absolutely clear the
allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike,
Inc.*, 568 U.S. 85, 91 (2013).

### 2.  Rule 8

Like the Nurse Defendants, Dr. Rodriguez-Martinez argues that all the claims against her
should be dismissed because Smith lumps her together with the Nurse Defendants and the

---

[13]  While Dr. Rodriguez-Martinez moves under Rule 12(b)(6), her mootness argument is addressed
pursuant to Rule 12(b)(1).

hospital but does not make any specific allegations against her.  Smith alleges that upon his

arrival in the emergency room, he explained to Dr. Rodriguez-Martinez that sensation in his legs

was going "in and out" and that he was "experiencing extreme pain in his neck, back, and legs,"

(Am. Compl ¶ 44), yet defendant "refused to provide him with medical treatment" (*id.* ¶ 47)

because of her perception and records of his substance-abuse disorder (*id.* ¶¶ 36, 46).  He alleges

that a series of tests were ordered, none of which was sufficient to detect the cause of his

symptoms.  (*Id.* ¶¶ 54-56.)  He alleges that defendant and her medical staff "repeatedly ignored,

downplayed, and belittled" Smith and insisted that he did not need medical assistance because he

was an "addict."  (*Id.* ¶ 51.)  These allegations are sufficiently specific to give Dr. Rodriguez-

Martinez fair notice of what she is being accused of having done.[14]

### 3. Intentional and negligent infliction of emotional distress (counts eleven and twelve)

Dr. Rodriguez-Martinez argues that (1) Smith's allegations do not rise to the level of

intentional or reckless conduct; (2) he does not allege outrageous or intolerable conduct; (3) the

wrongful conduct and emotional distress are not causally connected because it was the events

that occurred after Smith's last interaction with Dr. Rodriguez-Martinez that caused his alleged

symptoms of fear of law enforcement; and (4) the severity of Smith's distress is not extreme or

"so severe that no reasonable person could be expected to endure it."  *Russo*, 400 S.E.2d at 163.

To the contrary, Smith has pleaded intentional or reckless conduct.  For example, Smith

alleges that defendant knew or should have known that "emotional distress would likely result"

when a "trained medical professional" communicated "disbelief in a patient's presented

symptoms as a result of ongoing disability."  (Am. Compl. ¶ 288.)  Smith alleges outrageous and

---

[14] The court finds that the allegations against Dr. Rodriguez-Martines are distinguishable from those found insufficient in *Langford* for the same reasons discussed above with respect to the NRVRJ Officer Defendants and the Nurse Defendants.

intolerable conduct by defendant in denying Smith necessary medical care because of his disability and verbally harassing him; for example, defendant "belittled" Smith's condition and "ignored his cries for help" (*id.* ¶ 51).  In addition, defendant discharged Smith to Carroll County deputies while he was still experiencing debilitating pain, decreased sensation in his hands, shoulders, and neck, and an inability to stand or control the lower half of his body or urinate on his own.  (*Id.* ¶¶ 58, 59, 64.)  Smith also experienced emotional distress based on the treatment he received from defendant, and he alleges what occurred while in custody is part of an unbroken causal chain from defendant's treatment and decision to discharge Smith to the deputies.

The claim for negligent infliction of emotional distress survives for similar reasons and for the reasons stated elsewhere in this opinion.  As noted, Smith alleges a fright-related physical inability to breathe resulting from emotional distress.  *See, e.g.*, *Dao v. Faustin*, 402 F. Supp. 3d 308, 321 (E.D. Va. 2019) (concluding that "colds, sinus infections, upper respiratory infections, and severe knots in [the plaintiff's] back" were sufficient physical injuries to allege negligent infliction of emotional distress).

### 4.  Remedies

Dr. Rodriguez-Martinez also argues that Smith is not entitled to punitive damages, special damages, or attorney's fees.  These issues cannot be resolved on a Rule 12(b)(6) motion. *See Johnston v. Speedway, LLC*, 21CV00100, 2021 WL 1662725, at *4 (W.D. Va. Apr. 28, 2021) (denying defendant's motion to dismiss plaintiff's requests for emotional distress damages, punitive damages, and attorney's fees); *Charles v. Front Royal Volunteer Fire & Rescue Dep't Inc.*, 21 F. Supp. 3d 620, 629 (W.D. Va. 2014) ("A plain reading of Rule 12(b)(6) indicates that the rule may be used only to dismiss a 'claim' in its entirety.").

\*\*\*

For these reasons, Dr. Rodriguez-Martinez's motion to dismiss will be denied.

### III.  CONCLUSION

For the foregoing reasons, the court will issue an order granting and denying the pending motions as set forth in this opinion.

Entered: March 31, 2023.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge

41